# Exhibit G

Slip Copy, 2010 WL 3490980 (D.Conn.)
**(Cite as: 2010 WL 3490980 (D.Conn.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Andrew D. KOPPERL, Plaintiff,
v.
Kent S. BAIN, Automotive Restorations, Inc., Vintage Racing Services, Inc., John Rolls, and Lawrence A. Neviaser, Defendants.
**Civil Action No. 3:09-CV-1754 (CSH).**

Aug. 30, 2010.

David A. Ball, Stewart I. Edelstein, Cohen & Wolf, P.C., Bridgeport, CT, for Plaintiff.

David W. Case, James G. Green, Jr., McElroy, Deutsch, Mulvaney & Carpenter/Ph, LLP, Hartford, CT, for Defendants.

*RULING ON PLAINTIFF'S MOTION TO DISMISS AMENDED COUNTERCLAIMS OF CERTAIN DEFENDANTS*

HAIGHT, Senior District Judge:

**\*1** In this diversity action arising out of a failed commercial relationship, plaintiff moves pursuant to Rule 12(b)(6), Fed.R.Civ.P., to dismiss certain counterclaims asserted by certain defendants for failure to state claims upon which relief can be granted.

### I. BACKGROUND

According to his original Complaint [Doc. 1] and Amended Complaint [Doc. 29], Plaintiff Andrew D. Kopperl is a citizen of Massachusetts and an experienced auto racer, having participated in a number of seasons of professional Grand Am racing, and is technically proficient and knowledgeable about classic cars and racing cars.

Defendant Kent S. Bain is a citizen of Connecticut and the principal shareholder in the two corporate Defendants, Automotive Restorations, Inc. ("ARI") and Vintage Racing Services, Inc. ("VRS") (some-

times collectively, "the Bain Defendants"). ARI and VRS are Connecticut corporations with their principal places of business within the state. ARI sells and services classic cars and car parts to automobile collectors and enthusiasts. VRS restores, maintains and services classic racing cars.

The case has not progressed beyond the pleading stage. The parties' factual allegations are contained in Kopperl's original Complaint and Amended Complaint, the Bain Defendants' Answer, Affirmative Defenses, and Counterclaim [Doc. 14], and their Amended Counterclaim [Doc. 18]. Reading them, one would not think that these parties are inhabiting the same planet, let alone discussing the same case.

But it does appear to be common ground that in early 2006, Kopperl and Bain discussed the possibility of Kopperl becoming a partner in the business conducted by ARI and VRS. Kopperl alleges that Bain told him he owned controlling shares in ARI and VRS; Kopperl and Bain agreed that Bain would convey to Kopperl 50% of his ownership interest in the companies; Kopperl paid Bain $50,000 in March 2006 and $150,000 in September 2006 as "good faith deposits" toward his acquisition of 50% of Bain's interests in the companies; on November 1, 2006, Bain sent Kopperl a Letter of Agreement Bain had drafted to finalize that acquisition, which Kopperl signed and returned unchanged; and, in accordance with that letter agreement, on December 19, 2006 Kopperl paid Bain an additional $225,000 as a cash payment for Kopperl's acquisition of 50% of Bain's ownership interest in ARI and VRS.

To these allegations, the Bain Defendants enter a general denial. It would appear, however, that they acknowledge the existence of the letter agreement Kopperl signed and returned to Bain, since their first affirmative defense asserts that the contract Kopperl alleges is barred by the Statute of Frauds because Bain, the party sought to be charged, did not sign it. For their part, the Bain Defendants allege that on March 10, 2006, Bain and Kopperl signed a Letter of Intent and Agreement in Principle dated February 27, 2006, reciting their agreement that Kopperl would acquire 50% of Bain's interest in ARI and VRS, with the purchase price, Kopperl's payment of it, and the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3490980 (D.Conn.)
**(Cite as: 2010 WL 3490980 (D.Conn.))**

structure of the transaction to be contained in a sub-sequent "Definitive Agreement," the Letter further providing that both Bain and Kopperl would "make a good faith effort" to come to such agreement, which Kopperl thereafter failed and refused to do.

**\*2** It also appears to be common ground that Kopperl began employment at ARI and VRS, which was terminated on October 13, 2009, amid a welter of mutual ill will, charges and counter-charges, amply reflected by the pleadings' exchanges of broadsides.

Kopperl's Amended Complaint [FN1] contains these counts against the Bain Defendants: First, injunctive relief, ordering the Bain Defendants to reflect Kopperl's interest in the companies and issue stock certificates to him; Second, declaratory relief; Third, fraudulent misrepresentation; Fourth, negligent misrepresentation; Fifth, violations of the Connecticut Uniform Securities Act, Conn. Gen.Stat. § 36b-29(a); Sixth, breach of contract-stock; Seventh, breach of contract-amounts due; Eighth, violation of Conn. Gen.Stat. § 31-72 as to ARI and VRS; Ninth; violation of Conn. Gen.Stat. § 31-72 as to Bain; Tenth, breach of fiduciary duty; Eleventh, breach of contract implied in fact; Twelfth, promissory estoppel; Thirteenth, conversion as to personalty; Fourteenth, conversion of ownership interests; Fifteenth, violation of Conn. Gen.Stat. § 52-564; and Nineteenth, unjust enrichment. Counts Sixteen, for tortious interference with contractual relations, Seventeen, for tortious interference with business expectancy, and Eighteen, for civil conspiracy, are brought against Defendants Rolls and Neviaser only.

> FN1. Plaintiff's Amended Complaint [Doc. 29], originally titled a Third Amended Complaint, was filed by consent on July 16, 2010. That filing mooted Plaintiff's earlier motion to file a Second Amended Complaint, which had not been responded or objected to. The principal purpose of the Amended Complaint is to add two additional defendants, John Rolls and Lawrence A. Neviaser, citizens of New York and Maryland respectively, who alone or together with Bain are charged in several counts with interfering with or depriving Kopperl of contract rights and property interests that Kopperl anticipated acquiring as the result of his relationship with the Bain Defendants.

Rolls and Neviaser have been served and appeared through counsel, but not yet answered. These additional allegations and parties are not relevant to Kopperl's present motion to dismiss certain of the Bain Defendants' counterclaims against him.

The Bain Defendants' Amended Counterclaim contains these counts against Kopperl: First, breach of duty to negotiate in good faith; Second, declaratory relief; Third, fraudulent misrepresentation; Fourth, negligent misrepresentation; Fifth, breach of fiduciary duty; Sixth, breach of loyalty; Seventh, civil theft; Eighth, conversion; and Ninth, computer crime in violation of Conn. Gen Stat. § 53a-251.

Kopperl now moves under Rule 12(b)(6) to dismiss all the Bain Defendants' counterclaims except the Second, for declaratory relief. The Bain Defendants oppose the motion and argue for the legal viability of the challenged counterclaims.

## II. DISCUSSION

### A. Standard of Review

A motion to dismiss under Rule 12(b)(6) tests whether a pleading alleges a legally viable claim. In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009), the Supreme Court clarified the pleading standard required to withstand a motion to dismiss. Only a complaint or counterclaim that states a plausible claim for relief survives a motion to dismiss. Determining whether a pleading states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. While legal conclusions can provide the framework of a claim, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court must assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Although a court must accept as true all of the well-pleaded factual allegations in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

**\*3** The Supreme Court articulated these standards in *Twombly* and *Iqbal*. The Second Circuit has reiter-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3490980 (D.Conn.)
**(Cite as: 2010 WL 3490980 (D.Conn.))**

ated and applied them in cases such as _Ruston v. Town Board for the Town of Skaneateles,_ 610 F.3d 55, 58-59 (2d Cir.2010), and _Harris v. Mills,_ 572 F.3d 66, 71-72 (2d Cir.2009). Where a viable claim is comprised of several necessary elements, a claimant must allege facts sufficient under _Twombly_ and _Iqbal_ to satisfy each element. See, _e.g .,_ _RSM Production Corp. v. Fridman,_ No. 09-1202-cv, 2010 WL 2838582, *1 (2d Cir. July 21, 2010) (claims for tortious interference with contract and prospective economic advantage requiring plaintiff to allege that defendants' conduct caused the complained-of injury properly dismissed where "[l]ike the district court, we conclude that plaintiffs have failed plausibly to plead this element.") (citing _Iqbal_ and _Twombly_ ).

In cases where, as here, a federal court's subject matter jurisdiction is based upon the diversity of the parties' citizenship, the governing substantive law is that of the state where the court sits. Accordingly, the elements of the Bain Defendants' counterclaims are governed by the law of Connecticut.

**B. Analysis of the Bain Defendants' Counterclaims**

**1. _The Manner in which the Bain Defendants Plead their Counterclaims_**

The Bain Defendants assert their counterclaims against Kopperl in a pleading captioned "Amended Counterclaim" in the singular, but comprised of nine separately numbered and captioned counterclaims, designated as Counts One through Nine.

The pleading prefaces the nine counterclaims with 40 paragraphs of allegations, some factual and some conclusory, which describe a number of negligent, bad faith, or fraudulent acts on Kopperl's part constituting negligence, fraud, breach of contract, or violations of Connecticut statutes. The counterclaims themselves follow a formula. With the exception of Count Two, which demands declaratory relief, each counterclaim is given a caption describing its nature; the 40 prefatory paragraphs are incorporated by reference; some additional allegations are made in some of the counterclaims; a violation of the particular legal duty is asserted; and each counterclaim concludes with the allegation that ARI, VRS, and Bain "suffered damages." The nature and amount of the damages suffered are not pleaded with respect to any counterclaim.

Plaintiff moves under Rule 12(b)(6) to dismiss all the counterclaims except Count Two, which seeks declaratory relief.

**2. _The Counterclaims' Allegations of Damages_**

As noted, each of the Bain Defendants' counterclaims seeking monetary relief does nothing more than allege that as the result of Kopperl's conduct, as summarized in the counterclaim, the Bain Defendants have "suffered damages." There are no specific allegations, on any theory of recovery, with respect to the nature of those damages or their amount.

The Bain Defendants' brief appears to argue that the 40 paragraphs preceding the enumerated counterclaims contain all the necessary averments, leaving it to the Plaintiff (and to the Court) to match up the relevant paragraphs with each counterclaim's allegation of "damages." But the Bain Defendants' obligation to plead damages adequately may not be shifted in this fashion.

**\*4** Damages are an essential element of a claim at law for monetary loss. A defendant's conduct, however reprehensible, is not actionable unless the plaintiff pleads and proves (1) that plaintiff's conduct caused him damage (the _causation_ element) and (2) the amount of the damage with reasonable certainty, not left to surmise or speculation (the _quantum_ element). If one prefers to state the proposition in Latin, the maxim _damnum absque injuria_ comes to mind.

At the pleading stage, governed by Rule 12(b)(6), a plaintiff's demand for money damages must satisfy the _Twombly_ and _Iqbal_ requirement of factual, non-conclusory allegations stating a plausible claim that defendant's conduct caused specific economic harm in a quantifiable amount. See _Fink v. Time Warner Cable,_ No. 08 Civ. 9628, 2009 WL 2207920 at \*4 (S.D.N.Y. July 23, 2009) (where plaintiff claimed defendant's violation of Computer Fraud and Abuse Act "causes damage by impairing the integrity or availability of data and information, as well as certain communications and protocols," complaint dismissed because "[t]his allegation merely parrots the statutory language and is thus insufficiently factual to frame plausibly the damages element of plaintiff's CFAA claim.") (citing _Iqbal_ ).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3490980 (D.Conn.)
**(Cite as: 2010 WL 3490980 (D.Conn.))**

Similarly, in the case at bar, the Bain Defendants' formulaic repetition in each counterclaim of the mantra that they "suffered damages" as the result of Kopperl's conduct does not satisfy the pleading requirements of *Twombly* and *Iqbal*. Nor is the deficiency cured by reference to the 40 prefatory paragraphs. Their inadequacy in this respect is illustrated by the Bain Defendants' argument in their brief at 6 that their damages caused by Kopperl's fraudulent misrepresentation are sufficiently pleaded by the allegation that "in reliance on Kopperl's representations, Bain, ARI and VRS wasted several years during which time they could have sought a partner and co-manager in the business who would execute a definite agreement and who had the financial wherewithal to do so." One can only speculate what the Defendants may or may not have achieved if during those years they had sought other business partners. Such allegations do not state a plausible claim for an identified and quantified economic loss.

All the counterclaims challenged by Plaintiff's motion will be dismissed for failure to sufficiently allege damages. Leave will be given to replead damages for counterclaims which in all other respects state a viable claim. In repleading damages, the Defendants must state separately as to each counterclaim the nature of the injury or damages claimed and the amount as can best be calculated or estimated, coupled with factual allegations sufficient to state a plausible claim that the Plaintiff's alleged conduct giving rise to the particular counterclaim caused the complained-of injury.

In drafting any amended counterclaim pursuant to this Ruling, the Bain Defendants and counsel must keep in mind the provisions of Rule 11, Fed.R.Civ.P.

### 3. Count One: Breach of Duty to Negotiate in Good Faith

**\*5** Plaintiff moves to dismiss this counterclaim on the ground that the alleged "cause of action for breach of a duty to negotiate in good faith is not a cognizable claim" under Connecticut law. Main Brief at 4.

In opposing that motion to dismiss, the Bain Defendants point out that the Letter of Intent signed by both Kopperl and Bain provided that the parties will "make a good faith effort to come to an agreement,"

and contend that "Plaintiff ignores the distinction between a preliminary agreement that does not bind the parties to their ultimate contractual objective, but which does contain a binding agreement to negotiate open terms in good faith." Brief at 3. For the proposition that they may enforce against Kopperl a binding agreement to negotiate in good faith, the Bain Defendants cite and quote *Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d Cir.2008), which applied New York law.

*Vacold* is the most recent in a string of Second Circuit cases which divide binding preliminary agreements into two categories, Type I and Type II, with Type II binding the parties "to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework." *Id.* The earlier cases include *Network Enterprises, Inc. v. APBA Offshore Productions, Inc.*, 264 Fed.Appx. 36 (2d Cir.2008); *Brown v. Cara*, 420 F.3d 148 (2d Cir.2005); *Adjustrite Systems, Inc. v. GAB Business Services, Inc.*, 145 F.3d 543 (2d Cir.1998), and *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir.1989). These cases adopt and follow the seminal opinion of District Judge Pierre Leval (as he then was) in *Teachers Insurance & Annuity Association of America v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987), which first articulated the Type I/Type II analysis of binding preliminary agreements.

In the case at bar, the Bain Defendants contend that they have adequately pleaded a Type II binding preliminary agreement to negotiate in good faith the terms of the final agreement. "The considerations relevant to whether a binding Type II agreement exists are: (1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) whether there was partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Network Enterprises*, 264 Fed.Appx. at 37 (citing *Brown v. Cara*).

However, the question of whether the Bain Defendants have adequately pleaded an enforceable Type II agreement does not arise unless Connecticut law provides for such a cause of action. Judge Leval's decision in *Tribune* and the cited Second Circuit cases adopting it, including *Vacold*, all construed New York law. The Second Circuit made a particular point

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3490980 (D.Conn.)
**(Cite as: 2010 WL 3490980 (D.Conn.))**

of that in *Brown,* noting that in *Tribune,* Judge Leval
described the two types of binding preliminary
agreements after "collecting the relevant New York
law," 420 F.3d at 153, and adding in a footnote: "De-
fendants express some doubts as to whether Type II
agreements exist in New York law, or are merely a
creature of the federal courts. However, New York
courts have cited with approval *Tribune* and *Adjus-
trite,* and appear to recognize the possibility of 'Type
II' preliminary agreements." *Id.* at 153 n. 1 (citing
New York cases).

*6 I read *Brown* as an implicit but clear holding by
the Second Circuit that in a diversity case, a federal
court cannot enforce a Type II preliminary agreement
unless the law of the state where it sits recognizes the
concept. This is a logical requirement in diversity
cases, since some states explicitly reject the concept.
See, *e.g., Cinelli v. Ward,* 997 S.W.2d 474, 478
(S.Ct.Ky.1999):

> Simply stated, we view the Agreement as lacking
> the necessary definiteness of an enforceable con-
> tract requiring consummation of the proposed
> transaction and as lacking the requisite intent of the
> parties to be bound to same. We construe it as
> merely an attempt to bind the parties to good faith
> negotiations. We note that *some jurisdictions rec-
> ognize such agreements to negotiate in good faith*
> and have imposed a measure of damages for a
> party's failure to so negotiate. (citing *Tribune* ). *We
> seem to take the "all or nothing" approach:* Either
> the agreement is enforceable as a binding contract
> to consummate the transaction or it is unenforce-
> able as something less.

(citing Kentucky cases) (footnote omitted) (emphases
added).

Moreover, the most recent New York cases relax
their adherence to Type I/Type II preliminary agree-
ment analysis. In *IDT Corp. v. Tyco Group, S.A.R.L.,*
13 N.Y.3d 209, 215 n. 2 (2009), affirming the dis-
missal of a complaint, the New York Court of Ap-
peals said:

> The parties debate whether the settlement is a Type
> I or Type II preliminary agreement as used in fed-
> eral lines of cases (citing *Brown* and *Tribune* ).
> While we do not disagree with the reasoning in
> federal cases, we do not find the rigid classifica-

tions into "Types" useful.... [W]e find that it is
enough to ask in this case whether the agreement
contemplated the negotiation of later agreements
and if the consummation of those agreements was a
precondition to a party's performance. In the instant
matter, it clearly was.

In *Amcan Holdings, Inc. v. Canadian Imperial Bank
of Commerce,* 70 A.D.3d 423, 427 (1st Dept.2010),
the Appellate Division declined to follow *Tribune*
because "our Court of Appeals recently rejected the
Federal Type I/Type II classifications as too rigid"
(citing *IDT Corp.*). These cases would undermine the
Bain Defendants' reliance upon Second Circuit cases
construing New York law, even if New York law
governed this case, which it does not.

In the case at bar, the relevant question is whether,
under Connecticut law, a preliminary agreement may
bind a party to negotiate in good faith with respect to
the open issues and terms in the final contemplated
agreement, so that a failure or refusal to negotiate
those terms constitutes an actionable breach of con-
tract. The few Connecticut cases cited in the parties'
briefs do not directly address that question. In his
Main Brief at 4, Plaintiff relies on *Dacourt Group,
Inc. v. Babcock Industries, Inc.,* 747 F.Supp. 157, 160
(D.Conn.1990), a diversity case which cited only
*Tribune* and another case that applied New York law,
*Reprosystem B.V. v. SCM Corp.,* 727 F.2d 257, 264
(2d. Cir.1984). Appearing to accept the regimen set
forth in those New York cases without any discussion
of whether it was applicable under Connecticut law,
Judge Eginton rejected the plaintiff's claim on the
facts: "Based on the evidence presented, the Court
does not find that ... a *binding* preliminary agreement
sufficient to support an implied duty of good faith
existed." *Dacourt,* 747 F.Supp. at 160 (emphasis in
original). In light of the fact that *Dacourt* did not
discuss whether the duty to negotiate in good faith
applies in Connecticut or cite any Connecticut cases
recognizing such a duty, this Court does not consider
it persuasive authority that a cause of action for
breach of duty to negotiate in good faith exists under
Connecticut law.

*7 In a diversity case, a federal court's proper func-
tion is to apply the law of the state in which it sits,
not create that law. Therefore, in the absence of a
showing that this counterclaim is viable under Con-
necticut law, it will be dismissed under Rule 12(b)(6)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3490980 (D.Conn.)
**(Cite as: 2010 WL 3490980 (D.Conn.))**

for failure to state a claim upon which relief can be granted, without leave to replead.

### 4. Count Three: Fraudulent Misrepresentation

The gravamen of this counterclaim is that Kopperl fraudulently misrepresented "that he intended to negotiate and finalize the terms of a Definitive Agreement and that he had the financial wherewithal to complete the transaction." Bain Defendants' Brief at 5.

Plaintiff contends that this claim cannot be legally viable because there is no enforceable contractual obligation under Connecticut law to negotiate in good faith in the circumstances of the case, "and thus no claim can be asserted for a misrepresentation regarding a non-existent duty." Plaintiff's Reply Brief at 3. But the second proposition does not necessarily follow from the first. The elements of a cause of action for fraudulent misrepresentation are "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." *Billington v. Billington*, 220 Conn. 212, 217 (1991). A false representation by Kopperl that he intended to negotiate in good faith is a statement of fact that satisfies the first element, whether or not he had a legal duty to do so. The February 27, 2006 Letter of Intent and Agreement in Principle, signed by both Kopperl and Bain, establishes the timing, content and form of Kopperl's statements the Bain Defendants say were false. At least for the purpose of pleading a plausible claim, fraudulent intent may be inferred from Kopperl's alleged stonewalling of Bain's repeated efforts to get him to discuss the final contract terms.

Where the fraudulent misrepresentation counterclaim fails to pass *Twombly-Iqbal* muster is in the fourth element, which requires factual allegations sufficient to show that the Bain Defendants relied on Kopperl's false statements of intent "to [their] detriment," that is to say, Kopperl's conduct caused the Bain Defendants damages which must be adequately pled. Fraud is not actionable unless it causes damage. The deficiency of this counterclaim in that regard was discussed *supra*. This counterclaim will be dismissed, with leave to replead on the element of damages.

### 5. Count Four: Negligent Misrepresentation

I reach the same conclusion with respect to the Bain Defendants' counterclaim for negligent misrepresentation. The elements for this cause of action are that "(1) defendant had a duty to use reasonable care in giving information, (2) defendant supplied false information, (3) upon which the plaintiff relied, to its damages." *Winn v. Ameriquest Mortgage Co.,* No. CV-05-40150021 S, 2006 WL 122975 (Sup.Ct. Hartford Apr. 12, 2006). This claim arises out of the same nexus of facts pleaded in support of the counterclaim for fraudulent misrepresentation. Kopperl's argument that "Defendants make no claim that Plaintiff owed any *duty* to enter into an agreement with them," Main Brief at 8, misses the mark: the duty alleged on the part of Kopperl is to use reasonable care in giving information about his intentions and capacity during the course of serious and important discussions about a commercial relationship. This counterclaim is adequately pled, except for the element of damages, discussed *supra*. This counterclaim will be dismissed, with leave to replead on the element of damages.

### 6. Counts Five and Six: Breach of Fiduciary Duty and Breach of Duty of Loyalty

*8 The Amended Counterclaim alleges in prefatory ¶ 15 that, "[p]resuming that Bain and Kopperl would reach a definitive agreement, Bain hired Kopperl as a director of ARI and VRS, with his title to be determined by the definitive agreement."

Kopperl does not dispute on this motion that he was a director of the corporate defendants at times pertinent to the case. He does not deny that a company director owes a fiduciary duty and a duty of loyalty to the company. Notwithstanding Kopperl's contrary assertions, the counterclaims adequately allege acts that, if proven, would constitute breaches by Kopperl of those duties, principally the diversion to himself of company funds generated by transactions involving vehicles.

Kopperl's Reply Brief at 6 says that such allegations pertain to "his performance *as an employee* of ARI and VRS" and "are irrelevant to Mr. Kopperl's performance *as a director* of ARI and VRS, and thus irrelevant to a breach of fiduciary duty claim." No authority is cited for the doubtful proposition that a company director may wrongfully divert company

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3490980 (D.Conn.)
**(Cite as: 2010 WL 3490980 (D.Conn.))**

funds and escape a charge of breach of fiduciary duty because he was also an employee at the time. Most corporate employees are not directors, but this one was. Nor is there substance to Kopperl's contention that these counterclaims' "failure to allege that any of these transactions was either concealed from the Defendants, or unauthorized by them" render them insufficient under *Iqbal.* The descriptions of the transactions are introduced by the allegation in prefatory ¶ 26 that "Kopperl was also improperly and fraudulently booking sales of automobiles."

However, these counterclaims trail off into inadequate pleading. Count Five alleges that "Kopperl violated his fiduciary duties to ARI, VRS and Bain in various ways as aforedescribed," and "[a]s a result of the foregoing, ARI, VRS, and Bain have suffered damages." ¶¶ 43, 44. Count Six recites the same formula for the breach of the duty of loyalty. The Defendants and the Court are left to select from the 40 prefatory paragraphs the particular conduct that constitutes a particular breach. These counterclaims also fail to allege damages sufficiently, for the reasons previously stated. Counts Five and Six will be dismissed, with leave to replead, specifying which alleged acts of the Plaintiff constitute a breach of the duties involved, and stating a claim for damages in a manner consistent with this Ruling, or if so advised, asserting a claim for nominal damages. See *News American Marketing In-Store, Inc. v. Marquis,* 86 Conn.App. 527, 535 (2004).

### 7. Counts Seven and Eight: Civil Theft and Conversion

These counterclaims sufficiently allege actionable diversions by Kopperl of property belonging to the Bain Defendants. However, the allegations of damages are deficient. These counterclaims will be dismissed, with leave to replead a claim for damages in a manner consistent with this Ruling.

### 8. Count Nine: Computer Crime-Violation of *Conn. Gen.Stat. § 53a-251*

**\*9** Conn. Gen. Stat. § 53a-251 contains the state's computer-crime statute. Conn. Gen.Stat. § 52-570b provides that "any person who suffers any injury to person, business or property may bring an action for damages against a person who is alleged to have violated any provision of section 53a-251." The Bain

Defendants rely on that provision in asserting this counterclaim against Plaintiff.

Count Nine does not assert a plausible claim under the statute. All the prefatory paragraphs allege on this subject is that after his termination, "Kopperl breached the privacy and security of the electronic data used at ARI and VRS" and "surreptitiously and unlawfully accessed company email through the accounts and passwords of two other active employees" in conjunction with "several unsuccessful attempts by Kopperl to access the computer system under his own, then-deactivated, account." ¶¶ 37, 39. While the Bain Defendants allege that Kopperl accessed the companies' computer systems without authorization, there is no allegation that Kopperl used the accessed information in any way that caused damage to the Defendants. Accordingly, the Defendants do not state a viable statutory claim. In *News American,* 86 Conn.App. at 547-48, a case where unauthorized computer access undoubtedly occurred, the Connecticut Appellate Court held that "[i]n order to state a valid claim under § 52-570b, however, the plaintiff needed to show that it suffered injury," and the claim was properly rejected where the trial court "found that the record contained no evidence of injury, actual damages, unjust enrichment, actual loss or pecuniary loss suffered by the plaintiff." In the case at bar, there is no allegation of that necessary element.

While the Bain Defendants seek to distinguish *News American* on the ground that the defendant in that case was still in plaintiff's employ when he accessed the company's computers without authorization, whereas Kopperl's employment had been terminated, this is a distinction without a difference; injury is a necessary element in either event.

The Defendants also assert in their Brief at 11 that "[t]he legislation, however, does not require proof-or allegations-of pecuniary loss to satisfy the element of harm." For that proposition they cite and quote § 52-570b as follows: "Proof of pecuniary loss is not required to establish actual damages ..." This is in fact a partial quotation of § 52-570b(d), which reads in its entirety (with the words Defendants omitted in italics): "Proof of pecuniary loss is not required to establish actual damages *in connection with an alleged violation of subsection (e) of section 53a-251 arising from misuse of private personal data.*" The statute defines "private personal data" as "data concerning a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3490980 (D.Conn.)
**(Cite as: 2010 WL 3490980 (D.Conn.))**

natural person which a reasonable person would want to keep private and which is protectable under law." Conn. Gen.Stat. § 53a-250(10). The Defendants' counterclaim fails to allege that Kopperl accessed any private personal data, or that he misused any accessed data and caused injury thereby.

**\*10** Count Nine will be dismissed without leave to replead.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motion to dismiss Counts One and Nine of the Bain Defendants' Amended Counterclaim is GRANTED, without leave to replead.

Plaintiff's motion to dismiss Counts Three, Four, Five, Six, Seven and Eight of the Bain Defendants' Amended Counterclaim is GRANTED, with leave to replead. Any repleaded counterclaims must be filed and served not later than **September 22, 2010.**

It is SO ORDERED.

D.Conn.,2010.
Kopperl v. Bain
Slip Copy, 2010 WL 3490980 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit H

Westlaw.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
ALIKI FOODS, LLC, Plaintiff,
v.
OTTER VALLEY FOODS, INC., Defendant.
**No. 3:08cv626 (MRK).**

March 26, 2010.
Order Denying Motions to Vacate and Dismissing
Case July 7, 2010.

**Background:** Frozen foods company filed diversity
action against manufacturer alleging breach of con-
tract, breach of implied warranty, and negligence,
seeking lost sales and profits, including loss of future
earnings due to harm to its reputation. Manufacturer
moved for partial summary judgment. Manufacturer
subsequently moved for dismissal as discovery sanc-
tion.

**Holdings:** The District Court, Mark R. Kravitz, J.,
held that:
(1) economic loss doctrine applied to bar frozen
foods company from recovering on negligence claim;
(2) predominant or "essential" purpose of contract
was for sale of goods;
(3) contract was formed when manufacturer shipped
goods after company had ordered product; and
(4) dismissal of case as discovery sanction was war-
ranted.

Motions granted.

West Headnotes

**[1] Torts 379 ⟜118**

379 Torts
    379I In General
        379k116 Injury or Damage from Act
            379k118 k. Economic Loss Doctrine. Most
Cited Cases
In Connecticut, the economic loss doctrine is a judi-
cially created doctrine which bars recovery in tort
where the relationship between the parties is contrac-

tual and the only losses alleged are economic.

**[2] Torts 379 ⟜118**

379 Torts
    379I In General
        379k116 Injury or Damage from Act
            379k118 k. Economic Loss Doctrine. Most
Cited Cases
Under Connecticut law, the economic loss doctrine,
in essence, holds the aggrieved party to the bargain it
struck in its contract by preventing it from bringing a
tort action for what is really the breach of a contrac-
tual duty; this protects the parties' expectancy inter-
ests and encourages them to build cost considerations
into their contracts in the first place.

**[3] Products Liability 313A ⟜156**

313A Products Liability
    313AII Elements and Concepts
        313Ak154 Nature of Injury or Damage
            313Ak156 k. Economic Losses; Damage to
Product Itself. Most Cited Cases
Under Connecticut law, the economic loss doctrine
applies only in situations where the injured party al-
leges purely economic losses relating to the goods
themselves; thus, the economic loss doctrine gener-
ally does not bar recovery in tort if the plaintiff al-
leges either personal injury or damage to property
other than the goods for which the parties contracted.

**[4] Products Liability 313A ⟜156**

313A Products Liability
    313AII Elements and Concepts
        313Ak154 Nature of Injury or Damage
            313Ak156 k. Economic Losses; Damage to
Product Itself. Most Cited Cases

**Torts 379 ⟜118**

379 Torts
    379I In General
        379k116 Injury or Damage from Act
            379k118 k. Economic Loss Doctrine. Most
Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

Under Connecticut law, the economic loss doctrine generally applies only to contracts for the sale of goods, the origin of which lies not in the broad common law of torts or contracts, but in the narrower, express provisions of Article 2 of the Uniform Commercial Code, which establishes special rules governing the remedies available for breaches of commercial contracts for the sale of goods; thus, the economic loss doctrine does not typically apply to tort claims arising out of a contract for services.

**[5] Sales 343 ⌬3.1**

343 Sales
    343I Requisites and Validity of Contract
        343k3 Sale Distinguished from Other Transactions
           343k3.1 k. In General. Most Cited Cases
Whether a hybrid contract under which the seller supplies both goods and services is governed by the provisions of the Uniform Commercial Code (UCC) regarding the sale of goods, and thus subject to the economic loss doctrine under Connecticut law, is a question of whether the dominant factor or "essence" of the transaction is the sale of the materials or the services.

**[6] Sales 343 ⌬3.1**

343 Sales
    343I Requisites and Validity of Contract
        343k3 Sale Distinguished from Other Transactions
           343k3.1 k. In General. Most Cited Cases
In the absence of a dispute of material fact regarding the terms of the agreement, Connecticut law treats the "dominant factor" test as a question of law for the court to determine, when resolving whether the "essence" of the transaction is the sale of the materials or the services, and thus subject to the economic loss doctrine.

**[7] Fraud 184 ⌬25**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k25 k. Injury and Causation. Most Cited Cases

**Torts 379 ⌬118**

379 Torts
    379I In General
        379k116 Injury or Damage from Act
           379k118 k. Economic Loss Doctrine. Most Cited Cases
Under Connecticut law, the economic loss doctrine does not apply to intentional torts, such as fraud.

**[8] Bailment 50 ⌬9**

50 Bailment
    50k9 k. Condition of and Defects in Property, and Negligence of Bailor. Most Cited Cases

**Carriers 70 ⌬124**

70 Carriers
    70II Carriage of Goods
        70II(F) Loss of or Injury to Goods
           70k124 k. Extent of Liability. Most Cited Cases

**Negligence 272 ⌬463**

272 Negligence
    272XIV Necessity and Existence of Injury
        272k463 k. Economic Loss Doctrine. Most Cited Cases
Under New York law, the economic loss doctrine does not apply if the duty breached arose from a special relationship that requires the defendant to protect against the risk of harm to plaintiff; professionals, common carriers and bailees may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.

**[9] Torts 379 ⌬118**

379 Torts
    379I In General
        379k116 Injury or Damage from Act
           379k118 k. Economic Loss Doctrine. Most Cited Cases
Under Connecticut law, the economic loss doctrine is limited to situations where both the plaintiff and the defendant are sophisticated commercial parties.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
(Cite as: 2010 WL 2985030 (D.Conn.))

**[10] Food 178 ⚷25.13**

178 Food
    178k25 Liability for Injuries
      178k25.13 k. Nature of Injury or Damage.
Most Cited Cases
Economic loss doctrine applied under Connecticut
law to bar frozen foods company from recovering on
negligence claim against manufacturer for delivery of
allegedly contaminated food pursuant to agreement,
particularly where company had considered possibil-
ity of non-conforming goods, although elements of
negligence claim were different from that of breach
of contract claim and former could have succeed
even where latter would have failed.

**[11] Food 178 ⚷25.13**

178 Food
    178k25 Liability for Injuries
      178k25.13 k. Nature of Injury or Damage.
Most Cited Cases

**Sales 343 ⚷3.1**

343 Sales
    343I Requisites and Validity of Contract
      343k3 Sale Distinguished from Other Trans-
actions
        343k3.1 k. In General. Most Cited Cases
Predominant or "essential" purpose of contract be-
tween frozen foods company and manufacturer for
production and delivery of frozen fettuccine alfredo
with chicken and broccoli was for sale of goods un-
der Connecticut law, and governed by Article 2 of
Uniform Commercial Code (UCC), and thus eco-
nomic loss doctrine applied to bar negligence claim
for allowing food to be tainted with Listeria monocy-
togenes; contractual terms on labeling, packaging,
and delivering product were all ancillary to produc-
tion and sale of product itself. Conn. Gen.Stat. § 42a-
2-105(1).

**[12] Food 178 ⚷25.13**

178 Food
    178k25 Liability for Injuries
      178k25.13 k. Nature of Injury or Damage.
Most Cited Cases
Contract between frozen foods company and manu-

facturer for production and delivery of frozen fettuc-
cine alfredo with chicken and broccoli was formed
under Connecticut law when manufacturer shipped
goods after company had ordered product, and thus
negligence claim for delivery of allegedly contami-
nated food was barred by economic loss doctrine,
even if title to goods did not pass until several days
later. Conn. Gen.Stat. § 42a-2-206(1).

**[13] Federal Civil Procedure 170A ⚷1278**

170A Federal Civil Procedure
    170AX Depositions and Discovery
      170AX(A) In General
        170Ak1278 k. Failure to Respond; Sanc-
tions. Most Cited Cases
A court weighing discovery sanctions should con-
sider whether the non-compliant party's conduct
prejudiced the other side, though a showing of preju-
dice is not a requirement for dismissal. Fed.Rules
Civ.Proc.Rule 37, 28 U.S.C.A.

**[14] Federal Civil Procedure 170A ⚷1278**

170A Federal Civil Procedure
    170AX Depositions and Discovery
      170AX(A) In General
        170Ak1278 k. Failure to Respond; Sanc-
tions. Most Cited Cases
Dismissal of case as discovery sanction was war-
ranted, where plaintiff had acted willfully and in bad
faith in repeatedly violating its discovery obligations
and court's orders, duration of noncompliance was
extremely lengthy, plaintiff had been repeatedly
warned by court in strongest terms possible of conse-
quences of its behavior, defendant had been preju-
diced by plaintiff's conduct, alternative sanctions
would not have properly punished plaintiff for its
transgressions, deterred others from attempting simi-
lar conduct in future, compensated defendant for
prejudice caused by plaintiff, and not impacted
court's ability to administer justice in other cases be-
fore it. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**[15] Federal Civil Procedure 170A ⚷1551**

170A Federal Civil Procedure
    170AX Depositions and Discovery
      170AX(E) Discovery and Production of
Documents and Other Tangible Things

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

170AX(E)1 In General
    170Ak1551 k. In General. Most Cited
Cases
A party becomes obligated to preserve evidence
when it has notice that the evidence is relevant to
litigation or should have known that the evidence
may be relevant to future litigation.
Morris R. Borea, Robbie T. Gerrick, Rome McGuigan Sabanosh, Hartford, CT, for Plaintiff.

Mitchell R. Harris, Thomas O. Farrish, Day Pitney
LLP, Hartford, CT, for Defendant.

### RULING AND ORDER

MARK R. KRAVITZ, District Judge.

*1 Pending before the Court is the Motion for Partial
Summary Judgment [doc. # 67] of Defendant Otter
Valley Foods, Inc. ("Otter Valley"), requesting summary judgment on Count Two of the Second
Amended Complaint of Plaintiff Aliki Foods, LLC
("Aliki"). Otter Valley argues that Count Two,
alleging negligence, is barred by the economic loss doctrine, as articulated by the Connecticut Supreme
Court in *Flagg Energy Development Corporation v.
General Motors Corporation ("Flagg Energy")*, 244
Conn. 126, 154-55, 709 A.2d 1075 (1998), meaning
that Aliki is limited to its contractual remedies. *See
generally* Def.'s Mem. in Supp. of Mot. for Partial
Summ J. [doc. # 67-1]. For the reasons explained
below, the Court agrees, and therefore grants Otter
Valley's motion for summary judgment as to Count
Two of Aliki's Second Amended Complaint.

### I.

The facts of this case are straightforward and mostly
uncontested, with a few key exceptions. Plaintiff
Aliki, a Connecticut LLC, is a frozen foods company;
it sells frozen sandwiches, meal entrees, and pizzas,
primarily to food wholesalers such as Sam's Club,
Costco, and BJ's Wholesale Club ("BJ's"). Aliki,
however, does not manufacturer what it sells. Instead,
it contracts with other companies, including the Defendant, a Canadian company, to purchase and,
where necessary, import the food. Sometime in September 2003, Aliki engaged with Otter Valley to
manufacture two products, including Fettuccini Alfredo with Chicken and Broccoli (referred to by the
parties as "FACB"). Although the parties drafted a

contract, it was never signed and important parts of it
were left blank. *See* Draft Agreement dated Sept. 30,
2003, Ex. C to the Pappas Aff. in Opp'n to Def.'s
Mot. [doc. # 87-6]. Nonetheless, the parties agree that
they entered into an agreement whereby Otter Valley
agreed to manufacture, package, and label two Aliki
products (including the fettuccine alfredo), and that
Otter Valley performed its obligations under the
terms of the agreement for several years. *See* Second
Am. Compl. [doc. # 30] ¶¶ 8, 12; Def.'s Answer [doc.
# 35] ¶¶ 8, 12.

On or about September 25, 2007, Aliki ordered 880
cases of the product to be delivered to a BJ's distributor in Maryland, Burris Logistics ("Burris"), *see* Purchase Order, Ex. 2 to Def.'s 56(a)1 Statement [doc. #
68-3], and another 880 cases to be delivered to another BJ's distributor in Massachusetts, C & S
Wholesalers ("C & S"); *see* Purchase Order, Ex. 3 to
Def.'s 56(a)1 Statement [doc. # 68-4]. On or about
October 3, 2007, an Otter Valley transport truck containing the shipment of the product en route to Burris
was stopped at the U.S.-Canadian border by inspectors of the U.S. Department of Agriculture (USDA).
At the stop, the USDA inspectors took a sample of
the food and placed a "hold" on the product shipment. Thereafter, the truck proceeded to Burris
(which Aliki alleges it should not have done), and the
product was delivered to Burris that same day. It is
undisputed that Otter Valley emailed Mike Pappas,
the President of Aliki, to inform him of the USDA
"hold" on October 3, 2007, but a primary dispute
between the parties is when Mr. Pappas became
aware of the hold; Aliki says he did not receive the
email until several days later because Mr. Pappas was
travelling.

*2 On or about October 7, 2007, the USDA informed
Otter Valley that a test returned a "presumptive positive" result for the bacteria *Listeria monocytogenes*
("Listeria"). It is not clear what Otter Valley did with
this information, but it is undisputed that Burris informed Mr. Pappas the following day, October 8, of
the preliminary Listeria test results, and that by this
time some 75 cases of the product had already been
distributed to BJ's store locations. Mr. Pappas then
contacted the BJ's locations and had BJ's pull the
product. On October 9, 2007, the USDA contacted
Aliki and told it that the product should be recalled;
both Aliki and the USDA issued press releases that
day announcing the voluntary recall. *See* Press Re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

leases, Exs. H & I to the Pappas Aff. in Opp'n to Def.'s Mot. [doc. # 87-6]. Around the same time, Aliki discovered that the Otter Valley delivery of fettuccine alfredo to C & S on October 4 was from the same production run as that which tested positive for Listera. Aliki alleges, but Otter Valley denies, that it should have, but did not, inform Aliki of this fact earlier. Aliki's negligence claim is based upon this alleged failure to inform. *See* Second Am. Compl. [doc. # 30] ¶ 40(d). FN1 After notifying the USDA, Aliki expanded the voluntary recall to states beyond Maryland.

Aliki also alleges that on or about October 9, Otter Valley's Director of Q & A, Colleen Jameson-Homme, contacted Mr. Pappas to tell him that Otter Valley had submitted the wrong form to the USDA, mistakenly identifying the food as "ready to eat" instead of "cook to eat," resulting in the USDA testing the food for Listeria. The USDA apparently does not test "cook to eat" food for Listeria, as it is killed in cooking. Aliki also alleges that Otter Valley submitted the packaging to the USDA without the USDA-required "cook thoroughly" printed on it; whether Otter Valley was responsible for the packaging is another primary dispute in this case. On or about October 31, virtually all of the product subject to the USDA recall was destroyed, and on November 19, 2007, the USDA closed its file on the case.

Aliki filed suit on April 25, 2008, for breach of contract and negligence against Otter Valley, alleging lost sales and profits, including the loss of future earnings due to the harm to its reputation. *See* Compl. [doc. # 1]. On June 30, 2008, Aliki filed an amended complaint, adding a claim of breach of implied warranty and allegations that BJ's and/or C & S discontinued sales of Aliki's fettuccine alfredo and two of its other product lines as a result of the recall. *See* Am. Compl. [doc. # 4] ¶¶ 33, 35. Thereafter, on September 10, 2008, Otter Valley filed a motion to dismiss Count Two of the Amended Complaint (the negligence claim) on the basis of the economic loss doctrine. *See* Def.'s Mot. to Dismiss [doc. # 21]. Aliki filed a Memorandum in Opposition to the Motion to Dismiss [doc. # 25], but it also filed a second amended complaint on October 30, 2008, which made a handful of changes. *See* Second Am. Compl. [doc. # 30]. Among other changes, the new complaint added factual allegations that, over time, the terms of the parties' agreement "evolved" such that, by August

2006, Aliki would periodically send Otter Valley a "blanket purchase order" specifying some large number of cases of product to be prepared for the subsequent few months, *see id.* ¶ 10, 709 A.2d 1075, but that Otter Valley would not actually deliver any product until it received further documentation from Aliki; *see id.* ¶ 11, 709 A.2d 1075; *see also* Sample "Blanket Purchase Order" dated Dec. 2006, Ex. D to the Pappas Aff. in Opp'n to Def.'s Mot. [doc. # 87-6]. The Second Amended Complaint also changed the wording of Aliki's negligence claim against Otter Valley, removing all references to the existence of a contract. *See* Second Am. Compl. ¶ 40.

**\*3** The Court held an on-the-record telephonic conference with the parties on November 4, 2008 to discuss the partial motion to dismiss. During the call, the Court explained that it believed it more appropriate to handle the issue of the economic loss doctrine in the context of a motion for summary judgment. Defendant Otter Valley conceded that if it was determined that there was no contract between the parties-an issue of fact-the doctrine would not apply, and Aliki would not be limited to purely contractual remedies. Following the phone conference, the Court issued an order denying Otter Valley's partial motion to dismiss, but without prejudice to renewal in the context of a summary judgment motion. *See* Order [doc. # 31]. Otter Valley's pending motion for partial summary judgment, filed December 1, 2009, is essentially a renewal of its earlier motion to dismiss.

## II.

The summary judgment standard is a familiar one. Granting summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir.2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

As the moving party, Otter Valley bears the burden of demonstrating that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Aliki, as the nonmovant, is entitled to have all ambiguities resolved and all inferences drawn in its favor. *See Anderson,* 477 U.S. at 255; *Holcomb v. Iona College,* 521 F.3d 130, 137 (2d Cir.2008). However, if Otter Valley carries its burden, Aliki "may not rely merely on allegations or denials" to survive summary judgment. Fed.R.Civ.P. 56(e)(2). Rather, to successfully defeat the motion for partial summary judgment, Aliki must "set out specific facts," supported by admissible evidence, that show "a genuine issue for trial." *Id.* As the Supreme Court has put it in oft-quoted language, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted).

### III.

*4 [1] "The economic loss doctrine is a judicially created doctrine which bars recovery in tort where the relationship between the parties is contractual and the only losses alleged are economic." *Smith Craft Real Estate Corp. v. Handex of Conn., Inc.,* No. CV030082188S, 2004 WL 1615896, at *3 (Conn.Super.Ct. June 25, 2004) (citation omitted); *see also Flagg Energy,* 244 Conn. at 154-55, 709 A.2d 1075 (applying the doctrine). While simply stated, the doctrine and relevant case law can be confusing. *See, e.g., Santoro, Inc. v. A.H. Harris & Sons, Inc.,* No. CV030828039S, 2004 WL 2397155, at *4 (Conn.Super.Ct. Sept.23, 2004) ("With due respect to the parties, neither appears to have correctly understood or applied the Supreme Court's controlling opinion in *Flagg*."); *Milltex Properties v. Johnson,* No. 565866, 2004 WL 615748, at *4 (Conn.Super.Ct. Mar.15, 2004) ("The Superior Courts have been divided as to whether the doctrine truly has been adopted in Connecticut and if it has, when to apply the doctrine."); *Reynolds, Pearson & Co., LLC v.*

*Miglietta,* No. CV000801247, 2001 WL 418574, at *4 (Conn.Super.Ct. Mar.27, 2001) ("There is inconsistency in the decisions of Superior Court judges regarding the applicability of the economic loss doctrine in Connecticut."). For that reason, and for the sake of clarity, the Court finds it useful to discuss here a few of the doctrine's principles.

[2] The doctrine arose principally in the context of product liability, "where the economic losses are essentially contractual in nature, and therefore the risk may be allocated by the parties." *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 18 (2d Cir.2000) (citation omitted). The Supreme Court, in adopting the economic loss doctrine for general maritime law, explained that:

> Contract law ... is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

*East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 872-73, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (citations omitted). The economic loss doctrine, in essence, holds the aggrieved party to the bargain it struck in its contract by preventing it from bringing a tort action for what is really the breach of a contractual duty. This protects the parties' expectancy interests and encourages them to build cost considerations into their contracts in the first place. *See generally BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66, 72 (Colo.2004) (explaining the policy reasons for the doctrine); *see also Hartford Fire Ins. Co. v. Leninski,* No. CV970396097S, 2002 WL 31513608, at *3 (Conn.Super.Ct. Oct.29, 2002) ("Allowing tort claims for what is essentially a breach of contract would cause tort law to swallow up the body of common law surrounding contracts, including the appropriate measure of damages.") *Princess Cruises, Inc. v. Gen. Elec. Co.,* 950 F.Supp. 151, 156 (E.D.Va.1996) ("[T]o permit a party to a broken contract to proceed in tort where only economic losses are alleged would eviscerate the most cherished virtue of contract law, the power of the parties to allo-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

cate the risks of their own transactions.").

**\*5** [3] Nonetheless, there are limits and exceptions to the economic loss doctrine. One is that the doctrine only applies in situations where the injured party alleges purely economic losses relating to the goods themselves. Thus, the economic loss doctrine does not generally bar recovery in tort if the plaintiff alleges either personal injury or damage to property other than the goods for which the parties contracted. *See, e.g., Cornwall Bridge Pottery, Inc. v. Sheffield Pottery, Inc.,* No. 07CV1154, 2008 WL 906833, at \*3 (D .Conn. Apr. 2, 2008). This differential treatment is based on the different purposes served by contract and tort law:

> The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the cost of an injury and the loss of time or health may be an overwhelming misfortune, and one the person is not prepared to meet. In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs.... Losses like these can be insured. Society need not presume that a customer needs special protection. The increased cost to the public that would result from holding a manufacturer liable in tort to injury to the product itself is not justified.

*East River,* 476 U.S. at 871-72 (citations and quotation marks omitted); *see also Mountain West Helicopter, LLC v. Kaman Aerospace,* 310 F.Supp.2d 459, 465-66 (D.Conn.2004) ("[E]conomic losses resulting from a product failure are barred because they do not implicate the safety concerns of tort law.").

[4] A second limitation of the doctrine is that it generally applies only to contracts for the sale of goods, the origin of which "lies *not* in the broad common law of torts or contracts, but in the narrower, express provisions of Article 2 of the Uniform Commercial Code, which establishes special rules governing the remedies available for breaches of commercial contracts for the sale of goods ." *Santoro,* 2004 WL 2397155, at \*4; *see also Flagg Energy,* 244 Conn. at 154-55, 709 A.2d 1075 (explaining why a negligent misrepresentation claim is inconsistent with other claims arising under Article 2 of the UCC). Thus, the economic loss doctrine does not typically apply to

tort claims arising out of a contract for services. *See, e.g., Smith Craft Real Estate Corp.,* 2004 WL 1615896, at \*4 ("There is no allegation that the plaintiff's alleged damages resulted from the sale of a defective product. Therefore, the plaintiff's tort claims for economic loss are legally sufficient.").

[5][6] Of course, many contracts involve so-called "hybrid transactions," under which the seller supplies both goods and services. In that situation, whether the contract is governed by the UCC's provisions regarding the sale of goods-and thus subject to the economic loss doctrine-becomes a question of "whether the dominant factor or 'essence' of the transaction is the sale of the materials or the services." *Nora Beverages, Inc. v. Perrier Group of Am.,* 164 F.3d 736, 747 (2d Cir.1998) (quoting *Incomm, Inc. v. Thermo-Spa, Inc.,* 41 Conn.Supp. 566, 570, 595 A.2d 954 (Conn.Super.Ct.1991)). In the absence of a dispute of material fact regarding the terms of the agreement, Connecticut law treats the "dominant factor" test as a question of law for the court to determine. *See, e.g., Incomm,* 41 Conn.Supp. at 570, 595 A.2d 954; *Myrtle Mills Assocs. v. Bethel Roofing, Inc.,* No. 29-87-34, 1993 WL 382305, at \*2 (Conn.Super.Ct. Sept.14, 1993); *see also Cornwall Bridge Pottery,* 2008 WL 906833, at \*2; *Connie Beale, Inc. v. Plimpton,* No. FSTCV085008751 S, 2010 WL 398903 (Conn.Super.Ct. Jan.13, 2010) (determining, on a motion to strike, the "dominant factor" of a contract).

**\*6** [7] However, even when these requirements are met-and a plaintiff alleges purely economic losses related to a contract for the sale of goods-courts have, to varying degrees, carved out exceptions to the economic loss doctrine. One such exception is for intentional torts, such as fraud. *See, e.g., Dunleavey v. Paris Ceramics USA, Inc.,* No. CV020395709S, 2005 WL 1094424, at \*7 (Conn.Super.Ct. Apr.30, 2005). This exception is premised on at least two justifications. First, the possibility of tort liability could serve as an additional deterrent to the commission of intentionally wrongful acts; and second, it could permit the aggrieved party to recover damages not contemplated when drafting the contract due to that party's reasonable expectation that the other party would not intentionally cause it injury.

That said, courts are careful to distinguish an intentional tort from an intentional breach of the contract. In the latter situation, the bargained-for contract

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

remedies should sufficiently compensate the injured party. Moreover, "[a]lmost every breach of contract involves actions than can be conceived of as a negligent or intentional tort." *Princess Cruises, 950 F.Supp. at 156.* This task of looking beyond the labels and adjectives asserted by counsel to ascertain the gravamen of a claim is similar to what courts already do in related contexts. *See, e.g., Triangle Underwriters, Inc. v. Honeywell, Inc.,* 604 F.2d 737, 747 (2d Cir.1979) (rejecting the argument that the plaintiff had wrongfully pleaded a simple breach of contract claim as a fraud claim in order to take advantage of the latter's longer statute of limitations, and explaining that the case "does not involve an[ ] attempt to dress up a contract claim in a fraud suit of clothes .... [the plaintiff] clearly alleges fraud that was extraneous to the contract, rather than a fraudulent nonperformance of the contract itself"); Ruling and Order [doc. # 62], *GJN Advisors, Inc. v. Woolrich, Inc.,* No. 3:09CV338(MRK) (D.Conn. Jan. 20, 2010) at 2-4 (holding that although the plaintiff had successfully pleaded a breach of contract claim, it had not adequately pleaded a violation of the Connecticut Unfair Trade Practices Act-which requires substantial aggravating circumstances attending the breach-because "when one puts [the plaintiff's] adjectives to the side, and assesses the facts alleged .... this is a case in which [the plaintiff] alleges [only] that [the defendant] committed an intentional breach of contract").

[8] Another exception to the economic loss doctrine that some jurisdictions, including New York, recognize permits recovery under a tort theory if the duty breached arose "from a special relationship that requires the defendant to protect against the risk of harm to plaintiff." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctro., Inc.,* 96 N.Y.2d 280, 289, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001). "Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties. In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care." *Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 551-2, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992) (citations omitted); *see also Trs. of Columbia Univ. v. Gwathmey Siegel & Assocs. Architects,* 192 A.D.2d 151, 601 N.Y.S.2d 116, 119 (N.Y.App.Div.1993) ("[S]eparate tort liability [ ] can arise independently of the contractual relationship between the parties where the nature of the performance called for is affected with a significant public interest and failure to

perform the service carefully and competently can have catastrophic consequences.") (citation and quotation marks omitted). While well-developed in the New York courts, few Connecticut courts, if any, have had occasion to consider this exception.

*7 [9] Finally, some Connecticut trial courts, hewing closely to the facts in *Flagg Energy,* have limited the economic loss doctrine to situations where both the plaintiff and the defendant are sophisticated commercial parties. *See, e.g., Santoro,* 2004 WL 2397155, at *4; Milltex Props.,* 2004 WL 615748, at *2 ("[W]hen the parties are sophisticated corporations they are capable of negotiating contractual terms regarding the risk of loss."); *Morganti Nat., Inc. v. Greenwich Hosp. Ass'n,* No. X06CV990160125, 2001 WL 1249807, at *1 (Conn.Super.Ct. Sept.27, 2001) (describing the use of the economic loss doctrine as "most compelling" when, *inter alia,* "the parties are sophisticated corporations").

With these principles in mind, the Court turns to the merits of Otter Valley's argument that Aliki's negligence claim is barred by the economic loss doctrine.

## IV.

[10] In this case, there is no dispute that Aliki is alleging purely economic losses, *see* Pl.'s Local R. 56(a)2 Statement [doc. # 87-5] ¶¶ 6-7, and that it is not alleging any intentional wrongdoing on the part of Otter Valley. Prior to oral argument, there also seemed to be no genuine dispute that the parties were generally acting pursuant to a contractual relationship-albeit one whose exact terms were somewhat ambiguous. Nonetheless, Aliki has advanced three arguments for why the economic loss doctrine does not apply to bar its negligence claim. As explained below, each is unavailing.

First, Aliki argues that its negligence count is not barred because a jury could find for it even if it found that Otter Valley did not breach any contract between the parties. *See* Pl.'s Mem. in Supp. of Objection to Def.'s Mot. ("Pl.'s Mem. Opp'n") [doc. # 87-1] at 6-8. In particular, Aliki says that even if it cannot prove that the food was actually contaminated with Listeria, a jury could still find that Otter Valley was negligent in not informing the C & S Warehouse in Massachusetts of the presumptive positive test for the bacteria. *See id.* at 7-8. Second, Aliki argues that its allega-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

tions regarding the "negligent failure to inform" claim "go beyond a sale of goods transactions under the UCC," and thus do not trigger the economic loss doctrine. *Id.* at 9.

During oral argument on the motion, Aliki made a third argument, suggesting that summary judgment as to its negligence claim ought to be denied on account of the ambiguities surrounding the parties' contractual relationship. Relevant to this argument is Aliki's factual assertion that the product it ordered from Otter Valley remained the property of Defendant even after it was delivered to either Burris or C & S, up until it was physically pulled from the warehouse and shipped to BJ's. *See* Pappas Aff. [doc. # 87-6] ¶¶ 9, 11. As mentioned previously, the parties had drafted an agreement in 2003, but had never signed it. Counsel for Plaintiff suggested that a jury could conclude that a contract between the parties was not formed until Aliki performed its end of the bargain by pulling the product from the warehouse for delivery to the individual retail stores. In this case, the allegedly contaminated product was not pulled from the Burris warehouse until either the 7th or 8th of October, 2007; yet Aliki's negligence claim would have arisen when Otter Valley was informed of the USDA "hold" on October 3, 2007. Plaintiff's counsel argued that if a contract was not formed until after the negligence claim arose, the economic loss rule would not preclude Aliki's negligence claim. Following oral argument, the Court permitted the parties to file supplemental briefs to address this issue, *see* Order [doc. # 90], which they did. *See* Def.'s Supplemental Mem. in Supp. of Mot. for Partial Summ. J. [doc. # 97]; Pl.'s Supplemental Mem. in Opp'n to Mot. for Partial Summ. J. [doc. # 99].

*8 Aliki is correct that the elements it would have to prove for a negligence claim are different from that of a breach of contract claim, and that the former could succeed even where the latter fails. But this is hardly a reason for concluding that the economic loss doctrine does not apply. If anything, this argument highlights the doctrine's necessity by illustrating one of the incentives for a party to attempt to circumvent its contractual obligations. Moreover, this is hardly a situation where Aliki failed to consider the possibility of non-conforming goods, as demonstrated by the agreement drafted by the parties in 2003. *See* Draft Agreement dated Sept. 30, 2003, Ex. C to the Pappas Aff. in Opp'n to the Mot. for Part. Summary J. [doc. #

87-6]. Although never signed and incomplete in many material respects, the draft contract shows what terms the parties were considering. For example, although left blank, Exhibit B to the draft contract is entitled "Quality and Control Specifications for [Aliki] Products." The draft agreement stated that Otter Valley would manufacture and package the products in accordance with these specifications, *see id.* ¶ 1, and that Otter Valley would give Aliki certain warranties regarding the product, *see id.* ¶ 5. It also contained a provision on indemnification, *see id.* ¶ 7, whereby Aliki would have indemnified Otter Valley for any claim caused by any product that met the specifications in the contract, as well as for "any claim which is caused by [Aliki's] mishandling of the Product," *id.* ¶ 7(b). There is no comparable indemnification provision in the draft contract concerning claims arising out of Otter Valley's "mishandling" of the product. A jury will determine whether the parties ultimately intended to incorporate these or other provisions regarding who bore what risk into their contractual relationship, *see Presidential Capital Corp. v. Reale,* 231 Conn. 500, 507, 652 A.2d 489 (1994), but no matter what the jury finds, the Courts "see[s] no reason to intrude into the parties' allocation of the risk," *East River,* 476 U.S. at 73.

[11] Aliki's second argument-that its "negligent failure to inform" claim is not based on the sale of goods-relies on a mischaracterization of the "dominant purpose" test. Aliki seems to want to sever the service portion of the contract-the delivery of the product-and say it is not under Article 2 of the UCC. This it cannot do. If the "dominant purpose" of the contract as a whole was for the sale of goods, then the entire agreement is governed by Article 2. *See Incomm,* 41 Conn.Supp. at 570, 595 A.2d 954; *Myrtle Mills Assocs.,* 1993 WL 382305, at *2; *see also Cornwall Bridge Pottery,* 2008 WL 906833, at *2.

"Goods," under Connecticut law, are defined as "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale...." Conn. Gen.Stat. § 42a-2-105(1). While there are disputes of fact about some of the terms of the contract between these parties-in particular, which party was responsible for designing the product packaging and who assumed what risk with regards to product that failed FDA tests-even if the terms were as Aliki claims, this does not change the primary purpose of the agreement, which Aliki never

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

disputes was for the sale of goods. Therefore, the Court can make this determination as a matter of law. See *Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 24 (1st Cir.1993) ( "[Apellant] contends that the district court erred in ruling as a matter of law that the contract with [Appellee] was a sale of goods contract within the scope of the UCC. Although determining the type of contract at issue typically may be a jury function, we believe the facts here are sufficiently clear and undisputed that the district court was permitted to make its finding as a matter of law.") (citation omitted).

*9 Even taking the facts in the light most favorable to Aliki's position, the inescapable conclusion is that the predominant or "essential" purpose of the contract was the sale of goods-the frozen food products that Otter Valley manufactures and that Aliki sells to retail establishments. The contractual terms on labeling, packaging, and delivering the product (assuming they exist) are all ancillary to the production and sale of the product itself. Therefore, the entire contract is governed by Article 2, Aliki's argument to the contrary notwithstanding. See *Fab-Tech, Inc. v. E .I. du Pont de Nemours & Co.*, 311 Fed.Appx. 443, 445 (2d Cir.2009) ("While the agreements also contain provisions concerning exclusivity, marketing, delivery, and other arguably service-related matters, these matters are all incidental to the sale of DuPont's coating product."); *cf. Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir.1974) (explaining the test for determining whether Article 2 covers hybrid contracts as "whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.*, contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.*, installation of a water heater in a bathroom).") (footnotes omitted).

[12] The third argument for permitting Aliki's negligence claim to move forward-that a jury could find that there was no contract between these parties until Aliki actually pulled the product from the warehouse-is without support in either law or fact. First, under Connecticut law:

Unless otherwise unambiguously indicated by the language or circumstances ... an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship *or by the prompt or cur-*

*rent shipment of conforming or nonconforming goods.*

Conn. Gen.Stat. § 42a-2-206(1). Here, the undisputed evidence is that Aliki ordered the product in question on September 27, 2007. See Purchase Order, Ex. 2 to Def.'s 56(a)1 Statement [doc. # 68-3]; Purchase Order, Ex. 3 to Def.'s 56(a)1 Statement [doc. # 68-4]. It is further undisputed that Otter Valley shipped the goods on or before October 3, 2007, *see* Second Am. Compl. [doc. # 30] ¶ 13, constituting an acceptance. Thus, at the latest, a contract was formed when Otter Valley shipped the product-which is before Aliki's negligence claim would have arisen. Aliki's argument that title to the goods not pass to it until several days later is of no consequence, since it does nothing to change the date on which the contract for the sale of goods was formed. See Conn. Gen.Stat. § 42a-2-401(1) (providing that the formation of a contract and the passage of title are distinct).

Additionally fatal to Aliki's argument is that its director, Michael Pappas, submitted an affidavit that explains, in significant detail, how the parties entered into a contractual relationship in September 2003; how that agreement evolved over time; and why he believes Otter Valley breached it. *See, e.g.*, Pappas Aff. in Opp'n to Def.'s Mot. [doc. # 87-6] ¶ ("Some time in September of 2003, Aliki entered into an agreement (the 'Agreement') with Otter Valley to manufacture, package and label certain products, including, but not limited to ... Aliki Fettuccine Alfredo with Chicken and Broccoli; the ('Product')."). Aliki has presented no evidence-either through Mr. Pappas or otherwise-that even suggests that there was no contract as of September 2003, much less enough evidence that could lead a reasonable jury to the same conclusion.

*10 In sum, there is no genuine dispute of material fact that Otter Valley undertook the production and delivery of the allegedly contaminated fettuccine alfredo pursuant to an agreement with Aliki. The exact terms of that agreement and whether Otter Valley breached them will be matters for the jury to determine; but should the jury find Otter Valley liable, Aliki will be limited to the bargained-for contract remedies.

**V.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment [doc. # 67] is GRANTED, and the Defendant is granted summary judgment on Count Two of the Second Amended Complaint [doc. # 30]. Count One, alleging breach of contract, and Count Three, alleging breach of implied warranty, remain for trial.

IT IS SO ORDERED.

### *RULING AND ORDER*

On March 26, 2010, the Court granted Defendant Otter Valley Foods, Inc.'s ("Otter Valley") Motion for Summary Judgment on Count Two of Plaintiff Aliki Foods, LLC's ("Aliki") Second Amended Complaint. *See* Ruling and Order [doc. # 102]. The Court reviewed at length in that decision the facts of this case, and the Court refers readers to that decision for a more fulsome discussion of the substantive issues underlying this dispute. *See id.* at 1-5. Suffice it to say for present purposes that Aliki has sued Otter Valley for damages arising from two shipments of Fettuccini Alfredo with Chicken and Broccoli ("FACB")-from Otter Valley's factory in Canada to warehouses in Maryland and Massachusetts-that were tainted or possibly tainted with *Listeria monocytogenes* ("Listeria"). The Court's summary judgment decision left for trial the remaining two claims of Aliki's complaint-namely, claims of breach of contract and breach of implied warranty. *See id.;* Second Am. Compl. [doc. # 30].

Currently pending before the Court are several motions to dismiss and several motions to vacate this Court's prior orders. *See* Pl.'s Mot. to Vacate [doc. # 109]; Def.'s Mot. to Dismiss [doc. # 111]; Pl.'s Supplemental Mot. to Vacate [doc. # 112]; Def.'s Supplemental Mot. to Dismiss [doc. # 117]; Pl.'s Supplemental Mot. to Vacate [doc. # 118]; and Pl.'s Supplemental Mot. to Vacate [doc. # 125]. All of these motions relate to Aliki's failure to obey Court orders, produce documents, and preserve computers and hard-drives during the course of discovery. Because the Court finds as a fact that Aliki acted in bad faith in this case, the Court GRANTS Otter Valley's motions to dismiss [docs. 111, 117], DENIES Aliki's motions to vacate [docs. 112, 118, and 125], and dismisses this case with prejudice.

**I.**

**\*11** Otter Valley served interrogatories and requests for production on Aliki on September 19, 2008. *See* Def.'s First Set of Interrogs. & Reqs. for Prod, Ex. 4 to Def.'s Mot. for Sanctions [doc. # 64-6]. In its requests for production, Otter Valley asked Aliki to produce "[a]ny and all documents concerning [FACB], including but not limited to documents concerning the ... recall ... of the [FACB]." Otter Valley also requested Aliki to produce "[a]ny and all documents concerning the email" that Aliki claimed not to have received from Otter Valley "including but not limited to any documents concerning your alleged non-receipt of that e-mail." Finally, Otter Valley sought "[a]ny and all document concerning your damage claims," including "documents concerning any sale or profit that you allege you lost as a consequence of an act or omission of Otter Valley's." *Id.*

Aliki first responded to the interrogatories and requests for production on December 2, 2008. *See* Pl.'s Resp. to First Set of Interrogs. & Reqs. for Prod., Ex. 5 to Def.'s Mot. for Sanctions [doc. # 64-7]. Aliki produced 199 pages of documents and promised that more would be forthcoming. The first set of responses, however, were not signed by anyone at Aliki-as required by Rule 33(b)(3) of the *Federal Rules of Civil Procedure*-and two weeks later, Aliki sought to replace the first set of responses with a materially-different set, saying the first had been a "draft." *See* E-mail dated Dec. 17, 2009, Ex. 6 to Def.'s Mot. for Sanctions [doc. # 64-8]; Pl.'s Substitute Resps., Ex. 7 to Def.'s Mot. for Sanctions [doc. # 64-9].

Thereafter, on January 22, 2009, Aliki's President, Michael G. Pappas, was deposed in a parallel lawsuit between these parties in Canada. Mr. Pappas testified that "[t]here's a giant swath of documents that are on the recall that Otter Valley caused in the U.S .," and that those documents were in the possession of Aliki or its attorneys. *See* Pappas Canadian Dep., Ex. 8 to Def.'s Mot. for Sanctions [doc. # 64-10], at 113:20-21, 116:6-8. As a consequence of Mr. Pappas' testimony, Otter Valley began questioning Aliki's counsel regarding when the additional documents would be produced; at this point, Aliki had produced just the initial 199 pages. Otter Valley says that in May 2009, Aliki's counsel invited Otter Valley's attorney to retrieve additional documents from the former's office, but then reneged on that offer when Otter Valley's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

counsel arrived in his office lobby. *See* Def.'s Mem. in Supp. of Mot. for Sanctions [doc. # 64-2] at 6 (citing Letter dated June 2, 2009, Ex. 10 to Def.'s Mot. for Sanctions [doc. # 64-12] ). Otter Valley also says that at a settlement conference with Magistrate Judge Garfinkel on May 5, 2009, Aliki presented documents to Magistrate Judge Garfinkel that it had not produced to Otter Valley. *See id.* Aliki does not dispute either of these contentions.

During the course of this case, the Court held numerous telephonic conferences (far more than in the ordinary case) with the attorneys for the parties in order to resolve discovery disputes. Aliki's non-compliance with the Court's orders began more than a year ago. On June 9, 2009, following a telephonic conference with counsel, and in light of multiple extensions and unexplained delays, the Court ordered Aliki to produce all documents responsive to Otter Valley's document production requests no later than June 15, 2009. *See* Order [doc. # 45]. Between June 9 and June 15, Aliki produced another 703 pages of documents, but it did not produce all of the required documents by June 15; indeed, Aliki was still producing documents three months later.

**\*12** The Court held another telephonic conference with the parties on August 13, 2009, where Otter Valley again complained that Aliki had not complied with its discovery obligations or the Court's order of June 9, 2009. Following this conference, the Court entered an order expressly authorizing Otter Valley to move for sanctions if it had a good-faith belief that Aliki had violated the Court's prior order. *See* Order dated Aug. 14, 2009 [doc. # 50].

On August 5, 2009, Otter Valley noticed a deposition under Rule 30(b)(6) of the *Federal Rules of Civil Procedure* for the person most knowledgeable about Aliki's records and the damages it is claiming in this lawsuit. *See* Rule 30(b)(6) Dep. Notice [doc. # 64-12]. After being postponed several times, the deposition was scheduled to take place on October 20, 2009. The day before, on October 19, Otter Valley took the deposition (under Rule 30(b)(1)) of Mr. Pappas. *See* Pappas Dep. [doc. # 64-13]. Mr. Pappas testified at this deposition that Aliki kept all of its e-mails, *see id.* at 120:13-21, 132:20-23, but that "there is a large gap of missing e-mails" because the "hard drive failed on [his] laptop and [his computer vendor] did his best to save as much of the information as he

could and put it on our server," but "there was quite a bit of information that I lost," *id.* at 256:15, 256:24-257:3. Mr. Pappas also testified that he had created more than 25 pages of handwritten notes beginning when he first heard about the presumptive positive test for Listeria; that he had reviewed these notes between Aliki's first response to the interrogatories and requests for production (dated December 2, 2008) and its second, "substitute" set (dated December 17, 2008); and that, as of the date of the deposition (October 19, 2009), these notes were in the possession of Aliki's attorney. *See id.* at 113:4-114:4. As of that date, however, Aliki had not produced Mr. Pappas's handwritten notes; Aliki has still done so to this date.

During his October 19 deposition, Mr. Pappas indicated that he would be the Rule 30(b)(6) deponent the following day. When Mr. Pappas was unable to answer several questions that a Rule 30(b)(6) deponent would be expected to answer, Otter Valley became alarmed; its counsel placed its concerns on the record during the October 19 deposition. *See id.* at 273:15-274:6. The parties postponed the Rule 30(b)(6) deposition by another day to permit Mr. Pappas additional time to prepare; nonetheless, he was still unable to testify on several of the topics listed in the Rule 30(b)(6) Notice. *See* Pappas Rule 30(b)(6) Dep. [doc. # 64-17]. Mr. Pappas did clarify during the Rule 30(b)(6) deposition that his hard drive had failed "about four months ago," *id.* at 92:7-9, which, curiously, would have been right around the time of the Court's June 9, 2009 order requiring Aliki to immediately produce the hard drive's contents. *See* Order dated June 9, 2009 [doc. # 45].

Among the emails that Otter Valley says would have been on the failed hard drive were communications demonstrating that Otter Valley gave Aliki proper notice of the possibility that the FACB was tainted and should not be delivered to retail stores, as well as emails refuting Aliki's claims that the subsequent product recall caused it to lose sales. Otter Valley substantiated these claims by producing email communications that it sent Aliki, as well as emails between Aliki and one of its customers, Costco, that Otter Valley obtained by subpoenaing Costco's records.[FN1] Aliki has never produced the emails between it and Costco.

**\*13** Because of Aliki's conduct-in particular, the fail-

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

ure to search the hard drive during the nine months between receiving the requests for production and the drive's alleged failure; the failure to produce Mr. Pappas' handwritten notes; and Aliki's failure to produce a deponent prepared to testify on the matters indicated in the Rule 30(b)(6) Notice-Otter Valley moved for sanctions, requesting dismissal of the case. *See* Def.'s Mot. for Sanctions [doc. # 64]. Despite Aliki's evasive and incomplete responses to Otter Valley's arguments regarding Aliki's willful failures of discovery, the Court declined to dismiss the case at that time. However, in an attempt to mitigate the damage caused by the hard drive's alleged failure, the Court ordered Aliki to produce its computers and hard drives for a forensic examination. *See* Order dated Feb. 12, 2010 [doc. # 90]. In light of the possibility that the hard drive had been intentionally spoliated, the Court's Order added that if the examination revealed "information that Mr. Pappas ... intentionally destroyed" electronic evidence, "the case would be dismissed and Aliki would be paying legal fees." Tr. of H'ring on Feb. 11, 2010 [doc. # 91] at 33.

The Court also ordered Aliki to pay the first $10,000 of the cost of the forensic examination as a sanction for purposefully withholding documents properly requested by Otter Valley over a year before. However, the Court offered Aliki the opportunity to obtain relief from this financial obligation by demonstrating that it could not afford to pay for the forensic examination, which its counsel claimed was the case. The Court's Order stated as follows:

> As discussed during the hearing on February 11, 2010, Defendant's Motion for Sanctions is GRANTED in part and DENIED in part. The Court declines to dismiss the case at this time, but for the reasons stated on the record on February 11, 2010, the following sanctions are hereby imposed on Plaintiff Aliki Foods, LLC for its failures of discovery and violations of this Court's Order of June 9, 2009:(1) Defendant Otter Valley Foods, Inc. may conduct a forensic examination of the Plaintiff's computers at Plaintiff's expense, not to exceed $10,000; (2) Defendant may petition the Court no later than February 24, 2010 for its reasonable expenses and attorneys' fees related to its efforts after June 15, 2009 to extract documents from the Plaintiff, with the exception of the "pitch" documents, which shall be excluded from the calculations; [FN2] and (3) Plaintiff's testimony under Rule 30(b)(6) of

the *Federal Rules of Civil Procedure* shall be binding on the corporation, and Plaintiff shall not introduce evidence that contradicts its Rule 30(b)(6) witnesses. Should Plaintiff wish to be relieved of the obligation to pay for the forensic examination, it shall file a motion to that effect no later than February 24, 2010, *including with its motion all financial documents necessary for the Court to evaluate its ability to pay.* Defendant's request to extend the discovery period is denied, but without prejudice to renewal should additional evidence be uncovered that warrants an extension. Defendant's request for a spoliation instruction for either the failed hard drive or the handwritten notes is also denied without prejudice to renewal in connection with the parties' Joint Trial Memorandum.

Order dated Feb. 12, 2010 [doc. # 90] (emphasis added).

**\*14** On or about February 24, 2010, Aliki filed a Motion for Relief of Payment for Forensic Examination [doc. # 95]. In support of its motion, Aliki submitted some financial information, but it was woefully inadequate for the Court to determine whether Aliki could afford to pay for the forensic examination. The adequacies were pointed out by Otter Valley in its Memorandum in Opposition [doc. # 93], but Aliki provided no information to address them in its Reply Memorandum [doc. # 99]. The Court therefore denied Aliki's motion, noting in its ruling as follows:

> Now pending is Aliki's Motion for Relief from Payment for Forensic Examination [doc. # 95], which is hereby DENIED. Both during the hearing on the Motion for Sanctions and in its subsequent order, the Court was clear that the burden was on Aliki to substantiate its claim that it could not afford to pay for the forensic examination. This it has not done. While Aliki has submitted some financial information, the Court cannot determine whether it accurately portrays Aliki's ability to pay.

> For example, as Otter Valley points out, the financial statements submitted list only "club sales," and yet Aliki apparently has customers that are not warehouse clubs-for example, several professional sports teams. *See* Def.'s Opp'n to Pl.'s Mot. for Relief from Payment [doc. # 93] at 1-2. While Aliki states in reply that "the sales for the various sports teams are actually made" to a distributor, and that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

Aliki lists these sales as "club sales," Aliki provides nothing beyond its counsel's unsworn statement to substantiate this claim. *See* Pl.'s Reply Mem. [doc. # 99] at 1-2.

Otter Valley has also provided evidence demonstrating that Aliki failed to list at least one of its bank accounts-held jointly with one of its suppliers-in the financial statement submitted to the Court. *See* Def.'s Opp'n to Pl.'s Mot. for Relief from Payment [doc. # 93] at 2. Aliki argues that not only was this omission simply an "oversight," but further that "[t]his is a 'lock box' account which Aliki cannot make withdrawals from and is under the control of [the joint account holder]." See Pl.'s Reply Mem. [doc. # 99] at 2. But here again, Aliki provides absolutely no support for its contention beyond the bare assertions of counsel.

Given the doubts raised by Otter Valley regarding the completeness and veracity of the financial statements provided by Aliki, as well as Aliki's failure to provide any admissible evidence to support its arguments in rebuttal, the Court holds that Aliki has failed to carry its burden of demonstrating that it cannot afford to pay for the forensic examination of its computers-which, in any event, is only necessary because of Aliki's prior misconduct.

Order dated Mar. 26, 2010 [doc. # 101] at 1-3. The Court concluded by stating that its prior order that Aliki pay for the forensic examination of its computers, in an amount not to exceed $10,000, remained in effect as a sanction for Aliki's failures of discovery and its violations of this Court's order dated June 9, 2009. *See id.* at 3. Aliki was required to provide payment for the forensic examination by April 25, 2010, and the Court stated that "[s]hould Aliki fail to provide the required payment by this date, Otter Valley is authorized to move for the dismissal of this case on that basis." *Id.*

On April 25, 2010-the day the payment for the forensic examination was due-Aliki filed (without leave of the Court) a second motion requesting to be relieved of the obligation to pay for the forensic examination. *See* Pl.'s Mot. for Relief from Order [doc. # 109]. Aliki submitted an affidavit from Mr. Pappas dated April 23, 2010, in which he stated that one of its creditors, S & F Foods, Inc. ("S & F"), would be foreclosing on all of Aliki's assets-except Aliki's

cause of action against Otter Valley-as of April 27, 2010. *See* Pappas Aff. [doc. # 109-1]. On that basis, Aliki requested once more that it be relieved of its obligation to pay for the forensic examination of its computers. *See* Pl.'s Mot. for Relief from Order [doc. # 109] at 1-2.

*\*15* On April 28, 2010, Otter Valley moved to dismiss this case, not only for Aliki's failure to pay for the forensic examination-and its continued failure to substantiate its claim that it would be unable to pay for it even after the foreclosure-but also for Aliki's failure to preserve the hard drive in question. *See* Def .'s Mot. to Dismiss [doc. # 111]. Otter Valley enclosed with its motion an email dated March 31, 2010 from Aliki's counsel, which stated that Aliki was unable to "retrieve" the failed hard drive from its computer vendor. *See* Email dated Mar. 31, 2010 [doc. # 111-1]. Otter Valley also expressed alarm that Aliki was apparently willing to let S & F take possession of the hard drive without any attempt on Aliki's part to preserve it. *See* Def.'s Mot. to Dismiss [doc. # 111] at 3.

Two days later, on April 30, Aliki filed a Supplemental Motion for Relief [doc. # 112], enclosing with it a copy of the Surrender Agreement between Aliki, Mr. Pappas (as Guarantor) and S & F [doc. # 112-1]. Notably, this Surrender Agreement was *entered into just a week prior,* on April 23, 2010, two days before Aliki moved to be relieved of its obligation to pay for the forensic examintion. Aliki's motion also represented that "S & F Foods will foreclose on Aliki's assets which have already been surrendered pursuant to the Agreement." Pl.'s Supplemental Mot. for Relief [doc. # 112] at 1. Otter Valley responded on May 3 by pointing out that "[a]s with Aliki's other submissions, Aliki's [Supplemental Motion for Relief] does not prove Aliki cannot pay for the forensic examination of its computers.... At most, Aliki's Motion proves only that Aliki is not paying its bills." Def.'s Resp. to Pl.'s Supplemental Motion for Relief [doc. # 113] at 1. Otter Valley also questioned why Aliki had not submitted the security agreement between it and S & F-which was referenced in the Surrender Agreement as an exhibit thereto-and whether Mr. Pappas had an undisclosed relationship with or ownership interest in S & F. *See id.* at 1-2.

The Court held another on-the-record telephonic conference with the parties on May 4, 2010. Following

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

that conference, the Court gave Aliki yet another opportunity to prove its inability to pay for the forensic examination, entering an order that stated as follows:

> As discussed during the on-the-record telephone conference on May 4, 2010, and in order to substantiate its claims of insolvency, Aliki shall file financial statements reflecting both its and Mr. Pappas' assets no later than May 12, 2010. Aliki may file the statements under seal with the Court, and shall send a copy to Defendant's counsel. Otter Valley shall file a supplement to its Motion to Dismiss, including proposed alternatives to dismissal, no later than May 14, 2010. Aliki shall respond to Defendant's supplemental brief no later than May 21, 2010.

*16 Order dated May 5, 2010 [doc. # 114].

In response to the Court's order, Aliki filed a one-page unsworn, purported financial statement from Mr. Pappas, but no financial information about Aliki itself other than the hearsay representations of counsel (the Court's order notwithstanding). *See* Pl.'s Second Supplemental Mot. to Vacate Order [doc. # 118]. Aliki also enclosed an email to Aliki's counsel from S & F's attorney, in which the latter stated that S & F was "not interested" in making Aliki's computers and hard drives available for a forensic examination. *See id.,* Ex. B. In addition to pointing out Aliki's continued failure to provide information about its own financial state, Otter Valley responded to Aliki's filings by submitting evidence suggesting that Mr. Pappas' financial statement was materially incomplete. *See* Def.'s Opp'n to Pl.'s Second Supplemental Mot. to Vacate Order [doc. # 123]. In his financial statement, Mr. Pappas claimed that his only asset was a small bank account. *See* Ex. A to Pl.'s Second Supplemental Mot. to Vacate Order [doc. # 118]. However, a search of public records revealed that as of April 30, 2010, Mr. Pappas had a 31-foot, 700 horsepower oceangoing motor yacht registered in his name, *see* Ex. 1 to Def.'s Opp'n to Pl.'s Second Supplemental Mot. to Vacate Order [doc. # 123] at 9-11, and is listed by the Connecticut Secretary of State as the manager of a company bearing his initials-MPI Sales and Marketing, LLC, *see id.,* Ex. 2. While the Secretary of State's webpage does not list the company's owners, MPI's business address is Mr. Pappas' home address. *See id.* Neither the yacht nor MPI were mentioned in Mr. Pappas' financial statement. Otter Val-

ley also questioned one item that *was* on Mr. Pappas' financial statement: the fact that he is now employed as a well-paid consultant by S & F, raising serious questions about the circumstances surrounding Aliki's and Mr. Pappas' decision to hand over the failed (and presumably economically valueless) hard drive to Mr. Pappas' new, Michigan-based employer. *See* Def.'s Opp'n to Pl.'s Second Supplemental Mot. to Vacate Order [doc. # 123] at 3-4. Otter Valley argued that Aliki's submissions only underscored the propriety of dismissing this case with prejudice. *See id.*

Aliki responded to Otter Valley's arguments on May 21, 2010, but only in part. *See* Pl.'s Third Supplemental Mot. to Vacate Order [doc. # 125]. Aliki chose not to address Otter Valley's arguments regarding the veracity of Mr. Pappas' financial statement or to explain his relationship with S & F, but it did enclose an unsworn financial statement of Aliki Foods, dated May 10, 2010 and signed by Mr. Pappas, which listed this lawsuit as Aliki's only asset. *See id.,* Ex. A.

*17 The Court held yet another telephonic conference with the parties on May 25, 2010. During that call, counsel for Aliki represented that the yacht had been owned by Aliki and was seized by S & F as part of the asset foreclosure; and that MPI, Mr. Pappas' other company, was "inactive," and that Mr. Pappas' failure to mention it in his financial statement was merely an oversight. As has typically been the case with Aliki, however, these are merely the unsworn representations of counsel, which Aliki has made no attempt to substantiate with admissible evidence. Aliki's counsel also confirmed that all of the computers that the Court had ordered to be examined more than three months before were in the possession of S & F, and that whatever efforts (if any) Aliki had attempted to regain control of them for the forensic examination (which Otter Valley offered to finance) had been unsuccessful.

To summarize, Otter Valley first requested certain discovery-related materials of Aliki on September 19, 2008. When Aliki stonewalled Otter Valley for several months, the Court ordered, on June 9, 2009, that Aliki search for and produce the discovery-related material no later than the following week. Aliki claims that some of its efforts to comply with this Order were frustrated by the failure of a hard drive, which just happened to coincide with the entry of the Court's June 9, 2009 Order. Therefore, on February

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

12, 2010, the Court ordered Aliki to produce its computers, including the allegedly-failed hard drive, for a forensic examination, which Aliki was required to finance. The Court gave Aliki the opportunity to prove that it could not afford to pay for the forensic examination, but the Court was clear that even if Aliki could not afford to pay for the examination, Otter Valley was free to do so. Approximately two-and-one-half months later, Aliki and its principal, Mr. Pappas, entered into a Security Agreement with Mr. Pappas' new employer, S & F, whereby Aliki and Mr. Pappas voluntarily turned over to S & F the computers that the Court ordered to be examined, without making any effort whatsoever to have the forensic examination conducted beforehand. Moreover, as detailed above, and despite this Court's clear instructions to the contrary, Aliki has repeatedly chosen to submit highly-suspect documents to the Court (when it has submitted anything at all), relying on the unsworn hearsay statements of counsel to explain away multiple inconsistencies and omissions.

## II.

*18 "[D]iscovery orders are meant to be followed," *Bambu Sales, Inc. v. Ozak Trading Inc.,* 58 F.3d 849, 853 (2d Cir.1995), and "[a] party who flouts such orders does so at his peril," *Update Art, Inc. v. Modiin Publishing, Ltd.,* 843 F.2d 67, 73 (2d Cir.1988); *see also Agiwal v. Mid Island Mortgage Corp.* 555 F.3d 298, 302 (2d Cir.2009) (" '[A]ll litigants ... have an obligation to comply with court orders,' and failure to comply may result in sanctions, including dismissal with prejudice.") (quoting *Minotti v. Lensink,* 895 F.2d 100, 103 (2d Cir.1990)). Whether pursuant to Rule 37 of the *Federal Rules of Civil Procedure,* which is the rule invoked in this case, or the Court's inherent power-*see Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others") (internal quotations omitted)-dismissal with prejudice is a sanction of last resort. As the Second Circuit has cautioned, "dismissal with prejudice is a harsh remedy to be used only in extreme situations, and then only when a court finds 'wilfulness, bad faith, or any fault' by the non-compliant litigant." *Agiwal,* 555 F.3d at 302 (quoting *Bobal v. Rensselaer*

*Polytechnic Inst.,* 916 F.2d 759, 764 (2d Cir.1989)); *see also Salahuddin v. Harris,* 782 F.2d 1127, 1132 (2d Cir.1986); *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.,* 663 F.2d 371, 386 (2d Cir.1981).

[13] In *Agiwal,* the Second Circuit listed a number of factors that bear on the trial court's exercise of discretion to dismiss under Rule 37. These factors include: "(1) the willfulness of the noncompliant party or the reason for non-compliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the noncompliant party has been warned of the consequences of ... noncompliance." *Agiwal,* 555 F.3d at 302 (internal quotations omitted); *see also Bambu Sales,* 58 F.3d at 852-54; *Mills v. City of New Haven,* No. 08cv1046, 2009 WL 3769107, at *7-8 (D.Conn. Nov.10, 2009); *Nieves v. City of New York,* 208 F.R.D. 531, 535 (S.D.N.Y.2002). A court weighing sanctions should consider whether the non-compliant party's conduct prejudiced the other side, though a showing of prejudice is not a requirement for dismissal under Rule 37. *See S. New Eng. Tel. Co. v. Global NAPs, Inc.,* 251 F.R.D. 82, 90 (D.Conn.2008); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emples. & Rest. Emples Int'l Union,* 212 F.R.D. 178, 229 (S.D.N.Y.2003). Finally, as the court explained in Agiwal, "dismissal pursuant to Rule 37 is appropriate 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a sanction.' " *Agiwal,* 555 F.3d at 303 (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976)). As the district court noted in *Abreau v. City of New York,* 208 F.R.D. 526, 529 (S.D.N.Y.2002), "an award of sanctions under Rule 37 should effectuate its three purposes: (1) obtaining compliance with discovery orders; (2) ensuring the disobedient party does not benefit from noncompliance; and (3) providing a general deterrent in the particular case and in litigation in general."

## III.

*19 [14][15] Every factor identified in *Agiwal* favors dismissal of this case as a Rule 37 sanction. *First,* there is no question in the Court's mind that Aliki acted willfully and in bad faith in repeatedly violating its discovery obligations and this Court's orders. Aliki's bad faith is apparent from a number of factors.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

For one, Aliki has persisted in refusing to produce relevant documents to Otter Valley for nearly two years. A party becomes obligated to preserve evidence when it "has notice that the evidence is relevant to litigation ... [or] should have known that the evidence may be relevant to future litigation." *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998). Here, there is no question that Aliki was aware of the relevance of its computers and hard drive to this case. In fact, during an on-the-record telephonic conference on October 5, 2009, the Court asked Aliki's counsel whether his client had instituted a litigation hold to ensure that relevant emails were not destroyed. Though he did not say whether a hold was put in place, Aliki's counsel did represent that he had advised his client to do so.

Although Aliki may protest that it cannot be held accountable for the failure of a key hard drive, this comprises only one part of what the Court has ordered Aliki to produce. Moreover, Aliki certainly *can* be held accountable for not searching the hard drive for the nine months between receiving Otter Valley's request for production and the hard drive's failure, not to mention the failure to produce the hard drive (and its other computers) for the Court-ordered forensic examination and to produce the handwritten notes Mr. Pappas identified in his October 19, 2009 deposition. Additionally, when Aliki has responded to the Court's requests, its answers have been less than candid, and the Court finds that Aliki has been untruthful in certain of its responses, as discussed above. Moreover, the crash of the Aliki hard drive coinciding with this Court's June 9, 2009 order is highly suspect, particularly since: (a) Aliki did not notify the Court or Otter Valley of this circumstance until months later; (b) the Court ordered it to be forensically examined, and warned that if the examination revealed that the drive had been intentionally compromised, this case would be dismissed; and then (c) Aliki took affirmative steps to place the hard drive beyond the reach of the Court without alerting anyone of that impending possibility or making any effort to have the drive examined beforehand.

What is more, Aliki has violated a number of this Court's orders:

• Aliki failed to comply with the Court' June 9, 2009 order compelling it to produce all responsive documents by June 15, 2009.

• Aliki defied the Court's order by agreeing to give its computers to S & F without first searching for responsive documents.

• Aliki defied the Court's order that it pay for the forensic examination of the computers and hard drives. In its order dated March 26, 2010, the Court ordered Aliki to pay for the forensic examination no later than April 25, but Aliki failed to do so and did not file a second, unauthorized motion to vacate the Court's order until the day payment was due.

• Aliki refused to comply with the Court's various orders that it submit relevant, accurate, and complete financial information in connection with its motions to be relieved of the burden to pay for the forensic examination.

*20 To be clear, the most egregious of these failures is Aliki's and Mr. Pappas' decision, memorialized in the April 23, 2010 Security Agreement, to turn over Aliki's computers (including the failed hard drive) to a third party who happens to now employ Mr. Pappas. Aliki and Mr. Pappas made this decision two and half months *after* the Court ordered those same computers to be forensically examined. Despite the obvious consequences of handing over these computers and hard drive, neither Aliki nor Mr. Pappas made any effort whatsoever to have the computers examined first (for which Otter Valley offered to pay), or even to alert the Court or Otter Valley of the impending possibility that the computers would be given to S & F. Although Aliki argues that it *had* to turn the computers over, the timing and circumstances are highly suspect. See *S. New Eng. Tel. Co.,* 251 F.R.D. at 92-93; *Abreau,* 208 F.R.D. at 531. Moreover, given the May 25, 2010 representation of Aliki's counsel that the computers are currently stored in a warehouse, it is clear that the short period of time necessary to conduct the forensic examination would not have deprived S & F of the use of the computers-which, in any event, are unlikely to have much economic value. In fact, Mr. Pappas testified that the hard drive that contained most of the missing communications had *failed,* making it essentially worthless to anyone *except* Otter Valley, who argues (with evidentiary support) that the hard drive contained evidence detrimental to Aliki's claims. In short, Aliki intentionally spoliated its own computers and hard

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

drives despite the Court's order to the contrary. *See West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir.1999)* (emphasis added) ("Spoliation is the destruction or significant alteration of evidence, or *the failure to preserve property for another's use as evidence* in pending or reasonably foreseeable litigation.") (emphasis added).

In emphasizing the decision of Aliki to give its computers to S & F, the Court in no way suggests that Aliki's other actions were not themselves sanctionable; indeed, "[i]t would be excessively formalistic to view the defiance of [an] order in isolation rather than against the background of [a party's] prolonged and vexatious obstruction of discovery with respect to [related matters]." *Penthouse, 663 F.2d at 388.* Rather, it is in view of Aliki's prolonged defiance of its discovery obligations and this Court orders that convinces the Court that this is not a case of "purposeful sluggishness," *see Residential Funding Co. v. DeGeorge Financial Corp., 306 F.3d 99, 110 (2d Cir.2002)*, but rather one of repeated acts of bad faith and willfulness on the part of Aliki, *see S. New Eng. Tel. Co., 251 F.R.D. at 92.*

Second, the duration of noncompliance is extremely lengthy, as the recapitulation described above demonstrates. Aliki appears to have tried to evade Otter Valley's relevant and appropriate requests for production for as long as possible. Then, approximately a year ago, the Court orders Aliki to produce all of its records, and Aliki does no such thing. At the same time as the Court is trying to find a workable solution to the problem Aliki created, Aliki voluntarily gives its computers and the failed hard drive to a third party. For these reasons, the Court finds as a fact that Aliki's bad faith conduct has persisted for well over a year.

*21 *Third,* Aliki was repeatedly warned by the Court, and in the strongest terms possible, of the consequences of its behavior. Aliki was warned through its counsel during multiple on-the-record telephonic conferences, see Minute Entries for June 9, 2009 [doc. # 46], Aug. 13, 2009 [doc. # 52], Oct. 5, 2009 [doc. # 56], Dec. 15, 2009 [doc. # 77], May 4, 2010 [doc. # 115]; and May 25, 2010 [doc. # 126]; an in-court hearing on February 11, 2010, see Tr. of H'ring [doc. # 91]; as well as in orders issued by the Court. Indeed, Aliki had numerous opportunities to cure its non-compliance with the Court's orders; to say that

the Court has been patient with Aliki is an understatement. There is no doubt that Aliki knew that it risked dismissal of this action and that it pursued its course of action in deliberate defiance of that risk. In sum, Aliki persisted in "sustained and willful intransigence in the face of repeated and explicit warnings from the court that the refusal to comply with court orders ... would result in the dismissal of [the] action." *Agiwal, 555 F.3d at 303* (quoting *Valentine v. Museum of Modern Art, 29 F.3d 47, 50 (2d Cir.1994)*) (alterations in original).

*Fourth,* while a finding of prejudice is not necessary for the imposition of sanctions under Rule 37, *see S. New Eng. Tel. Co., 251 F.R.D. at 90; Met. Opera Ass'n, Inc., 212 F.R.D. at 229*, the Court finds that Otter Valley has been prejudiced by Aliki's conduct. Otter Valley has been prejudiced in two ways. For one, it has had to incur legal fees-which are undoubtedly substantial at this point-for motions for sanctions to try to get Aliki to comply with the Court's orders and its discovery obligations. For another, and more importantly, Otter Valley no longer has access to the "giant swath" of relevant documents that Mr. Pappas admits Aliki had in its possession. If those documents favored Aliki there would have been no reason not to have produced them to Otter Valley long ago. That Aliki purposely and in bad faith did not produce the documents and then took deliberate steps to spoliate the computers and hard drive strongly suggest that the documents were, in fact, damaging to Aliki's case, which is why they were never produced. *See New Eng. Tel. Co., 251 F.R.D. at 92-93* ("[A party] need not prove that the deleted files were material; 'the intentional or grossly negligent destruction of evidence in bad faith can support an inference that the destroyed evidence was harmful to the destroying party.' ") (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 110 (2d Cir.2002)*). While the Court cannot now obtain compliance by Aliki with the Court's orders regarding the spoliated evidence, the Court can make it clear to these parties and to parties in future litigation that such conduct is not acceptable. *See, e.g., West, 167 F.3d at 779; Kronisch, 150 F.3d at 126.*

*Fifth,* the Court must consider alternatives to dismissal and the Court has done so from the very beginning of this odyssey. The Court has considered imposing sanctions against Aliki's attorney, but based on the telephonic conversations and the course of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

conduct leading up to the spoliation of the computers and hard drive, the Court is convinced that the bad faith was on the part of Aliki and Mr. Pappas, and not Aliki's counsel. The Court also considered monetary sanctions in lieu of dismissal-and, in fact, imposed such sanctions-but Aliki and Mr. Pappas maintain (in highly suspect submissions) that they cannot pay any financial sanctions. Therefore, imposing financial sanctions on Aliki or Mr. Pappas would be a hollow exercise.

**\*22** Finally, the Court has considered and ordered the parties to brief the issue if alternative sanctions would be appropriate, including deeming certain facts admitted at trial; directing the jury that Aliki could not prove certain aspects of its case; or even providing the jury with an adverse inference charge. *See* Def.'s Supplemental Mot. to Dismiss [doc. # 117]; Pl.'s Obj. to Supplemental Mot. to Dismiss [doc. # 124]. But the Court believes these alternative sanctions would be inadequate, for they would impose on Otter Valley the cost of a trial when Aliki would be highly unlikely to prove its breach of contract or warranty case with certain key facts deemed admitted or uncontestable. That is, deeming the facts relating to Otter Valley's notifications to Aliki regarding the allegedly-tainted product as established in Otter Valley's favor would, in effect, be the same as dismissing the case (or nearly so), although the parties would have to expend further resources on a trial that would be unlikely to change the outcome. *See S. New Eng. Tel. Co.,* 251 F.R.D. at 95 ("While adverse inferences can be effective tools for situations involving the destruction of evidence, in this case the extent of defendants' noncompliance and either willful withholding or destruction is so extensive that any adverse inference sufficient to sanction defendants and address the harm to [plaintiff] would effectively amount to a directed verdict or the equivalent of a default judgment."); *Gutman v. Klein,* No. 03cv1570, 2008 WL 4682208, at \* 12 (E.D.N.Y. Oct.15, 2008) ("[L]esser sanctions such as adverse inferences are ill-suited to a case like this, where the spoliator has, in bad faith, irretrievably deleted computer files that likely contained important discovery information.") (citing cases).

Just as important, the Court does not believe that merely deeming certain facts admitted in Otter Valley's favor would be a sufficient sanction for Aliki's flagrant defiance of its discovery obligations and this Court's orders. First, as discussed above, Otter Valley has argued that Aliki's computers contained emails that would be highly damaging to Aliki's claims; if true-and there is evidentiary support to believe that it is-deeming certain facts admitted would simply put Aliki in the same position that it would have been in had it satisfied its discovery obligations in the first place. Such a result would not compensate Otter Valley for the resources it has expended in wasteful discovery-related motions practice, nor would it serve as a deterrent to either Aliki or other litigants that would countenance similar conduct. *See Abreau,* 208 F.R.D. at 529.

Moreover, it would leave unpunished the tremendous waste of judicial resources occasioned by Aliki's actions. As the Second Circuit warned nearly 30 years ago:

> **\*23** If parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules.

*Penthouse,* 663 F.2d at 388. The situation here is arguably worse than that foreshadowed in *Penthouse,* as Aliki continues to flout its obligations even as the Court has lost patience. The degree to which this Court has had to supervise Aliki's compliance with its discovery obligations has been significant-not to mention a tremendous waste of resources-and largely for naught, as Aliki intentionally and deliberately destroyed the very evidence that this Court ordered it to produce months ago and that it had an obligation to produce well over a year before.

In light of Aliki's conduct, and despite the Court's view that dismissal is a last resort to be avoided if at all possible, there does not appear to be any alternative to dismissal that would properly punish Aliki for its transgressions; deter others from attempting similar conduct in the future; compensate Otter Valley for the prejudice caused by Aliki; and not impact this Court's ability to administer justice in the other cases before it. *See Nat'l Hockey League,* 427 U.S. at 643 ("[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)
**(Cite as: 2010 WL 2985030 (D.Conn.))**

a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."); *Jones v. Niagara Frontier Transp. Auth.,* 836 F.2d 731, 735 (2d Cir.1987) ("[I]n this day of burgeoning, costly, and protracted litigation courts should not shrink from imposing harsh sanctions where ... they are clearly warranted.") (quoting *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1068 (2d Cir.1979)); *S. New Eng. Tel. Co.,* 251 F.R.D. at 96 (entering default judgment as a sanction for the defendant's willful defiance of court orders and its discovery obligations in order "to prevent defendants' willful noncompliance and destruction [of evidence] from impacting the court's other cases and thus impacting the orderly administration of justice for other litigants.").

### IV.

Accordingly, for the foregoing reasons, the Court GRANTS Otter Valley's motions to dismiss [docs.111, 117] and DENIES Aliki's motions to vacate [docs. 112, 118, and 125] the Court's prior orders. **The Clerk is directed to dismiss this case with prejudice and to close the file.**

IT IS SO ORDERED,

> FN1. Aliki's negligence claim, as pleaded in the Second Amended Complaint, also includes allegations that Otter Valley failed to properly label the product and that it was negligent in submitting the wrong applications to the USDA for approval. *See* Second Am. Compl. [doc. # 30] ¶¶ 40(a)-(c). In opposing Otter Valley's motion for summary judgment on its negligence count, however, Aliki has argued only that the allegations concerning Otter Valley's mishandling of the USDA "hold" state a valid tort claim. *See* Pl.'s Objection to Def.'s Mot. [doc. # 86] at 1 ("The relevant allegations for purposes of Aliki's objection are contained at Par. 40(d)...."). Accordingly, the Court considers only those allegations identified by Aliki as relevant to the motion in this opinion.

> FN1. Aliki had alleged that the recall of the FACB (due to the presumptive positive test for Listeria) had damaged its relationship with Costco, thereby costing Aliki sales.

However, the email, from Costco to Aliki, states that the recall should not cause any problems for their ongoing relationship. *See* Email dated Oct. 10, 2007 from Jim Stafford, Costco Vice President for the Northeast Region, to Mr. Pappas, Ex. 15 to Def.'s Mot. for Sanctions [doc. # 64-16] ("We know you value the Costco business and do not anticipate that this have any impact on our relationship going forward.").

> FN2. Otter Valley subsequently moved for recovery of its attorneys' fees, *see* Def.s' Pet. for Award of Attorneys' Fees [doc. # 92], but the Court denied this motion, without prejudice to renewal, finding that Otter Valley "larded into its petition hours that [were] not reasonably related to the delays and extra work caused by Aliki's failures of discovery." Order dated Apr. 8, 2010 [doc. # 108]. To date, Otter Valley has not renewed this motion.

D.Conn.,2010.
Aliki Foods, LLC v. Otter Valley Foods, Inc.
--- F.Supp.2d ----, 2010 WL 2985030 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit I

Westlaw.

Not Reported in A.2d, 2010 WL 3328322 (Conn.Super.)
**(Cite as: 2010 WL 3328322 (Conn.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Hartford.
WOLF COLORPRINT, INC.
v.
Michael MARINO et al.
**No. CV096005913S.**

Aug. 2, 2010.

DOMNARSKI, J.

**\*1** A hearing on the motion referred to above was
held on June 22, 2010. This action arises out of the
attempts by the plaintiff, Wolf Colorprint, Inc., a
printing company, to purchase a printing press. The
defendants are MKM Importers, Inc. (MKM), which
buys and sells printing equipment, and Michael Mar-
ino and Mark Marino, who are the officers and own-
ers of MKM.

In the eighteen-count revised complaint, which it
filed on April 16, 2010, the plaintiff alleges the fol-
lowing facts. In 2009, the plaintiff and the defendants
had several conversations and meetings in which they
discussed the possibility of the plaintiff purchasing a
particular printing press that was owned by a third
party, Pentagraphix Offset Printing, Inc. (Penta-
graphix). Ultimately, the plaintiff offered to purchase
the press directly from Pentagraphix, signed a contact
to do so and sent Pentagraphix a check for a deposit
on the purchase. Shortly thereafter, Pentagraphix
deposited the check and sent the plaintiff a signed
contract. In telephone conversations over the follow-
ing days, Mark Marino told the plaintiff's president,
Jack Meier, that he had learned of the purchase, that
the plaintiff did not have the right to speak with Pen-
tagraphix directly, but could only do so through
MDM, and that the plaintiff would never get the
press. Pentagraphix's owner, Jonathan Chung, then
told Meier that Pentagraphix would not sell the press
to the plaintiff because the defendants threatened and
enticed Pentagraphix to not do so. In addition, Mark

Marino falsely told Chung that Meier and Glenn Ba-
sale, the plaintiff's vice president, were dishonest and
that the defendants had an exclusive agreement with
the plaintiff to act as its representative in all of its
printing press purchases. The defendants knew or
should have known that their conduct would cause
Pentagraphix to breach its contract to sell the press to
the plaintiff and that this would harm the plaintiff's
business, which it did.

Further, the plaintiff alleges that Bill Woodford, who
is the president of another third party, C & S Press,
had previously told Basale that his company was in-
terested in installing the press for the plaintiff. A
short time later, Woodford told Balsale that the de-
fendants had learned of this interest, and they threat-
ened to stop giving him work if he continued to do
work for the plaintiff. Woodford told Basale that C &
S Press would no longer submit bids to do installation
and repair work for the plaintiff. The defendants
knew or should have know that this conduct would
reduce the competition for doing this work for the
plaintiff, and cause the plaintiff to pay more for these
services.

The plaintiff alleges the following causes of action;
in counts one through three, a claim against each de-
fendant for tortious interference with a business ex-
pectancy, as to its contract with Pentagraphix; in
counts four through nine, two claims against each
defendant for tortious interference with a business
relationship, as to its relationships with Pentagraphix
and C & S Press; in counts ten through twelve, a
claim against each defendant for violations of the
Connecticut Unfair Trade Practices Act (CUTPA); in
counts thirteen through fifteen, a claim against each
defendant for defamation; and in counts sixteen
through eighteen, a claim against each defendant for
intentional infliction of emotional distress.

**\*2** On April 21, 2010, the defendants filed a motion
to strike in which they argue that every count of the
complaint is legally insufficient to state a cause of
action upon which relief can be granted. Moreover,
they ask the court to grant their motion with prejudice
as they have filed three motions to strike and the
plaintiff has not remedied "any of the defects from its
... earlier complaints." The plaintiff filed an objection

Page 2

Not Reported in A.2d, 2010 WL 3328322 (Conn.Super.)
**(Cite as: 2010 WL 3328322 (Conn.Super.))**

to the defendants' motion on June 7, 2010, in which it argues that it has alleged adequate facts to support all of its causes of action. As the plaintiff accurately notes, the motion before the court is the defendants' second motion to strike, not its third. The defendants filed a reply on June 18, 2010.

*DISCUSSION*

The following procedural history is relevant to the defendants' motion to strike. The defendants filed their first motion to strike on December 8, 2009. Therein, they argued that each count of the plaintiff's operative complaint, which was then the amended complaint that the plaintiff filed on December 3, 2009, was legally insufficient for various particular reasons. The plaintiff did not file an objection to the motion. The court, Hale, J., granted the motion, but did not issue a written memorandum of decision. The revised complaint, which is presently the operative pleading, contains numerous factual allegations that were not in amended complaint. In their second motion to strike, the defendants argue not only that the plaintiff has failed to cure the legal insufficiencies that they raised in their first motion to strike, but they also raise additional grounds on which they contend that some of the counts are legally insufficient.

As to these additional grounds, it is noted that "[m]ost [trial] courts [that] have considered the issue have found that successive motions to strike are not appropriate. Although the appellate courts have not ruled on the issue, in numerous cases, the judges of the Superior Court have concluded that the rules of practice preclude a party from filing successive motions to strike when the grounds raised in a later motion could have been raised in the initial motion ... [T]he judges reason that Practice Book [§ 10-41] provides that each motion to strike shall set forth each such claim of insufficiency and shall distinctly specify the reason or reasons for each claimed insufficiency ... [Because] [t]he Practice Book provides for pleading multiple grounds in a single motion to strike and, further, provides that pleadings are to advance after the adjudication of each enumerated pleading, a defendant may not impede the progress of the suit by dividing his grounds and pleading them in consecutive motions to strike ... [Therefore], a defendant who has failed to raise all grounds for striking a complaint may not [later] file a second motion to strike asserting additional grounds ..."

"[Nevertheless], [a] second motion to strike may be appropriate in limited circumstances. For example, when a plaintiff pursuant to Practice Book § 10-44,[FN1] files a subsequent pleading alleging new facts ... Additional motions to strike, however, are not allowed when the grounds asserted therein could have been raised in an earlier motion." (Internal quotation marks omitted.) *Grant v. James Street, LLC,* Superior Court, judicial district of New Haven, Docket No. CV 09 5027291 (July 2, 2009, Zoarski, J.) (48 Conn. L. Rptr. 192, 194). Although the defendants' second motion to strike arguably falls within this category, "the seemingly large loophole created by the allowance of successive motions to strike in the wake of new factual allegations is not as gaping as it first appears." *Grazioli v. Nichols,* Superior Court, judicial district of New Haven, Docket No. CV 06-5001604 (October 2, 2007, Lopez, J.) (44 Conn. L. Rptr. 273, 275). Even in those circumstances, the party filing the subsequent motion to strike must confine itself to grounds that pertain to the new factual allegations in the amended pleading, and the court properly declines to consider grounds that the movant could not have raised in its initial motion. *Id.* According, the court declines to consider the grounds that the defendants raise in their second motion to strike that they could have, but did not, raise in their first motion to strike.

> FN1. Practice Book § 10-44 provides in relevant part: "Within fifteen days after the granting of any motion to strike, the party whose pleading has been stricken may file a new pleading ..."

*3 As to the question of whether the plaintiff cured the deficiencies that were present in its amended complaint, the doctrine of the law of the case is relevant.[FN2] "The law of the case doctrine applies where a motion to strike is directed to an amended complaint that is substantially the same as a previous version thereof which was already stricken." *Haven Health Center v. Parente,* Superior Court, judicial district of Litchfield, Docket No. CV 03 0091743 (January 18, 2006, Bozzuto, J.). Assuming the judge considering the second motion to strike agrees with the ruling of the judge on the first motion to strike, "[i]f the amended complaint state[s] a new cause of action, the [motion to strike] should [be] denied. If, however, the amended complaint mere restate[s] the original cause

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3328322 (Conn.Super.)
**(Cite as: 2010 WL 3328322 (Conn.Super.))**

of action, without curing the defect, the [motion to strike] [is] properly granted." (Internal quotation marks omitted.) *Melfi v. Danbury*, 70 Conn.App. 679, 684, 800 A.2d 582, cert. denied, 261 Conn. 922, 806 A.2d 1061 (2002). After reviewing the plaintiff's amended complaint and the defendants' first motion to strike, this court concludes that Judge Hale correctly decided that the motion should be granted.

> FN2. "The law of the case doctrine expresses the practice of judges generally to refuse to reopen what [already] has been decided ... New pleadings intended to raise again a question of law which has been already presented on the record and determined adversely to the pleader are not to be favored ... Where a matter has previously been ruled upon interlocutorily, the court in a subsequent proceeding in the case may treat that decision as the law of the case, if it is of the opinion that the issue was correctly decided, in the absence of some new or overriding circumstance ..."

> "[The Supreme Court] has determined that although a judge should be hesitant to rule contrary to another judge's ruling, he or she may do so [n]evertheless, if the case comes before him [or her] regularly and [the judge] becomes convinced that the view of the law previously applied by [a] coordinate predecessor was clearly erroneous and would work a manifest injustice if followed ..." (Internal quotation marks omitted.) *Brown & Brown, Inc. v. Blumenthal*, 288 Conn. 646, 656, 954 A.2d 816 (2008).

The next issue is whether the plaintiff, in its revised complaint, cured the deficiencies that the defendants relied upon in their first motion. In this regard, it is noted that "[t]he function of a motion to strike is to test the legal sufficiency of a pleading; it admits all facts well pleaded. The role of the trial court [is] to examine the [complaint], construed in favor of the plaintiffs to determine whether the plaintiffs have stated a legally sufficient cause of action." *Napoletano v. CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 232-33, 680 A.2d 127 (1996), cert. denied, 520 U.S. 1103, 117 S.Ct. 1106, 137 L.Ed.2d 308 (1997). "[I]f facts provable in the com-

plaint would support a cause of action, the motion to strike must be denied ... Moreover ... [w]hat is necessarily implied [in an allegation] need not be expressly alleged." (Internal quotation marks omitted.) *Coalition for Justice in Education Funding, Inc. v. Rell*, 295 Conn. 240, 252, 990 A.2d 206 (2010).

On the other hand, in ruling on a motion to strike, the nonmovant's legal conclusions are not "deemed to be admitted." (Internal quotation marks omitted.) *Murillo v. Seymour Ambulance Assn., Inc.*, 264 Conn. 474, 476, 823 A.2d 1202 (2003). Therefore, "[a] motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves*, 262 Conn. 480, 498, 815 A.2d 1188 (2003).

*Counts One Through Nine*

*Tortious Interference with Business Expectancy and Business Relationships*

In their first motion to strike, the defendants maintained that the plaintiff's claims for tortious interference with business expectancy and tortious interference with business relationships were legally insufficient because the plaintiff failed to allege that it suffered an actual loss as a result of their conduct. As to this issue, in its amended complaint, the plaintiff merely alleged that "[a]s a direct result of [the defendant's] purposeful actions [in interfering with its relationships with Pentagraphix and C & S Press, Inc.], Plaintiff has suffered great financial harm and detriment."

**\*4** In the revised complaint, the plaintiff incorporates into counts one through nine allegations that the defendants' conduct prevented the plaintiff from purchasing the printing press from Pentagraphix, which, in turn, prevented it from soliciting and obtaining additional work that was suited to the press; prevented it from increasing its profitability by improving its efficiency; caused it to incur additional labor costs; and reduced its pricing flexibility. In addition, the plaintiff alleges that the defendants' conduct caused C & S Press to decline to bid on the plaintiff's repair and installation work, which, in turn, reduces the competition for such work and will cause the plaintiff to pay higher prices for such services, thereby increasing the plaintiff's expenses and de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3328322 (Conn.Super.)
(Cite as: 2010 WL 3328322 (Conn.Super.))

creasing its profits. In their second motion to strike, the defendants argue that the new allegations are merely conclusory and based on speculation, and these counts are still legally insufficient on this basis. The plaintiff counters that its additional allegations are sufficiently specific to provide notice of the damages it claims to have incurred as to these counts.

"[I]n order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that: (1) a business relationship existed between the plaintiff and another party; (2) the defendant intentionally interfered with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffered actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.,* 255 Conn. 20, 32-33, 761 A.2d 1268 (2000). Similarly, "[a] claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." (Internal quotation marks omitted.) *Appleton v. Board of Education,* 254 Conn. 205, 212-13, 757 A.2d 1059 (2000).

As to both causes of action, the Supreme Court has stated the following as to the actual loss element: "Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss ... it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss." (Citation omitted; internal quotation marks omitted.) *Hi-Ho Tower, Inc. v. Com-Tronics, Inc., supra,* 255 Conn. at 33 (discussing tortious interference with business expectancy); see *Appleton v. Board of Education, supra,* 254 Conn. at 213 (discussing tortious interference with business relationships). "Therefore, in order to survive a motion for summary judgment the plaintiff must allege an 'actual loss' resulting from the improper interference with [its] contract ... [T]he tort is not complete unless there has been actual damage suffered." (Citation omitted; internal quotation marks omitted.) *Appleton v. Board of Education, supra,* 254 Conn. at 213.

*5 The Supreme Court has also noted that " '[a] major problem with damages of this sort ... is whether

they can be proved with a reasonable degree of certainty ... If the question is whether the plaintiff would have succeeded in attaining a prospective business transaction in the absence of [the] defendant's interference, the court may, in determining whether the proof meets the requirement of reasonable certainty, give due weight to the fact that the question was "made hypothetical by the very wrong" of the defendant. Sometimes, when the court is convinced that damages have been incurred but the amount cannot be proved with reasonable certainty, it awards nominal damages.' Restatement (Second), Torts § 774A, comment (c) (1979). Thus, an award of compensatory damages is not necessary to establish a cause of action for tortious interference as long as there is a finding of actual loss, and a finding of actual loss may support an award of punitive damages." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc., supra,* 255 Conn. at 34.

Here, the plaintiff's allegations are necessarily hypothetical, and whether it will be able to prove them with a reasonable degree of certainty is a matter for the trier of fact. The allegations are, however, sufficient to satisfy the requirement that the plaintiff must allege sufficient facts to show that it sustained an actual loss due to the defendants' conduct. Therefore, the defendants' motion to strike is denied as to counts one through nine.

*Counts Ten Through Twelve*

*Violations of CUTPA*

In their first motion to strike, the defendants argued that the plaintiff had not adequately alleged claims that the defendants violated CUTPA because it did not allege that it had a business relationship with the defendants. In the amended complaint, the plaintiff alleged that it entered into an agreement to purchase the press from Pentagraphix, and Chung then informed him that he could not sell the press to the plaintiff because the defendants threatened and enticed him not to fulfill Pentagraphix's contract with the plaintiff. The plaintiff also alleged that Michael Marino told the plaintiff's president that it would never get the press. The plaintiff incorporated these allegations into its CUTPA counts, and alleged that the defendants' actions violated CUTPA in that the conduct constituted unfair and deceptive acts in the conduct of the defendants' business, and caused the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3328322 (Conn.Super.)
**(Cite as: 2010 WL 3328322 (Conn.Super.))**

plaintiff to suffer financial harm and detriment.

In the revised complaint, the plaintiff adds numerous allegations regarding the contacts that it had with the defendants prior to the time that Pentagraphix notified it that the defendants had threatened and enticed it not to sell the press to the plaintiff. Specifically, the plaintiff alleges that: it notified Mark Marino that it was searching for a press; MKM made several offers to sell the press at issue and another press to the plaintiff, at his request, Mark Marino visited the plaintiff's office and discussed the possible purchase of a press; Mark Marino, Meier and Basale visited the Pentagraphix plant together to look at the press, and Mark Marino made several representations to the plaintiff regarding the ownership of the press. The plaintiff incorporates these allegations into counts ten through twelve, and adds that the defendants are engaged in the trade or commerce of selling printing equipment, that their conduct constituted unfair and deceptive acts as that term is used in CUTPA, and that the plaintiff suffered financial harm as a result of this conduct.

*6 In their second motion to strike, the defendants argue the plaintiff's CUTPA claims remain legally insufficient in that the plaintiff does not allege that the parties had a business relationship. They also add three other grounds for striking these claims, specifically, they are legally insufficient in that: the conduct on which the claims are premised was not done in the conduct of trade or commerce; the claims are premised upon one isolated act; and the plaintiff does not allege that it sustained an ascertainable loss. The court declines to consider these additional grounds as the defendants could have raised them in their first motion to strike, but did not do so. As to the ground at issue, the plaintiff counters that its allegations show that the defendants were actively engaged in trying to sell a printing press to the plaintiff and treated the plaintiff as a potential customer.

"CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of the act, [General Statutes] § 42-110b(a), states merely that '[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.' General Statutes § 42-110b(a). Trade or commerce, in turn is broadly defined as 'the advertising, the sale or rent or lease, the offering for sale or rent or lease,

or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.' General Statutes § 42-110a(4). The entire act is remedial in character; General Statutes § 42-110b(d) ... and must be construed liberally in favor of those whom the legislature intended to benefit." (Citation omitted; internal quotation marks omitted.) *Fink v. Golenbock,* 238 Conn. 183, 212-13, 680 A.2d 1243 (1996).

Nevertheless, "[a]lthough our Supreme Court repeatedly has stated that CUTPA does not impose the requirement of a consumer relationship ... the court also has indicated that a plaintiff must have at least *some* business relationship with the defendant in order to state a cause of action under CUTPA. See *Ventres v. Goodspeed Airport, LLC,* [275 Conn. 105, 155, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S.Ct. 1913, 164 L.Ed.2d 664 (2006) ] ..." (Citations omitted; emphasis in original.) *Pinette v. McLaughlin,* 96 Conn.App. 769, 778, 901 A.2d 1269, cert. denied, 280 Conn. 929, 909 A.2d 958 (2006).

Clearly, the plaintiff has alleged adequate facts to satisfy the requirement that it allege that it had a business relationship with the defendants. Contrary to the defendants' arguments, the plaintiff is not required to allege that it was a customer of or in competition with the defendants. In *Macomber v. Travelers Property & Casualty Corp.,* 261 Conn. 620, 643, 804 A.2d 180 (2002), the court emphasized that "[w]e have previously stated in no uncertain terms that CUTPA imposes no requirement of a consumer relationship ... [W]e [have] concluded that CUTPA is not limited to conduct involving consumer injury and that a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury." (Citation omitted; internal quotation marks omitted.) As the Appellate Court has noted, in *Ventres,* "[t]he court observed that ... in *Macomber v. Travelers Property & Casualty Corp., supra,* 262 Conn. at 626, the parties had ... a business relationship with each other because, although the plaintiffs were neither consumers nor competitors of the defendant, they had entered into settlement agreements with the defendant. *Ventres v. Goodspeed Airport, LLC, supra,* [275 Conn.] at 157-58." *Pinette v. McLaughlin, supra,* 96 Conn.App. at 778 n. 9.

*7 Furthermore, contrary to the defendants' assertion,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3328322 (Conn.Super.)
**(Cite as: 2010 WL 3328322 (Conn.Super.))**

the plaintiff has not expressly denied that it had any business relationship with the defendants. Instead, in the portion of the complaint that the defendants rely upon for this assertion, the plaintiff alleges that the defendants' statement that they had an exclusive agreement to represent the plaintiff in all of its printing press purchases was false in that the plaintiff did not enter into such an agreement with the defendants. This allegation does not negate the plaintiff's allegations regarding the nature of its relationship with the defendants.

Accordingly, the defendants' motion to strike is denied as to counts ten through twelve.

*Counts Thirteen through Fifteen*

*Defamation*

In their first motion to strike, the defendants argued that the plaintiff's claims for defamation were legally insufficient because the plaintiff failed to allege that they made any defamatory statements and did not plead its claims with adequate specificity. In the amended complaint, the plaintiff merely alleged, without providing any details, that the defendants published false comments that the plaintiff lacked integrity and had engaged in dishonest conduct to third parties, that the defendants knew that the statements were false and the statements caused the plaintiff to suffer financial harm.

In the revised complaint, the plaintiff adds the following allegations that pertain to counts thirteen through fifteen: Pentapraphix's president told Meier and Basale that Mark Marino told him that Meier and Basale were dishonest and that the defendants had an exclusive agreement to represent the plaintiff in its purchases of a printing press; these statements were false and impugned the plaintiff's integrity; the defendants knew or should have known that these statements were false and that would cause harm to the plaintiff, they made the statements with malice and to harm the plaintiff, and the statements harmed the plaintiff in several specific ways. In their second motion to strike, the defendants contend that these counts are legally insufficient because the plaintiff has not alleged any facts showing that any of the defendants made any statements in which they disparaged the plaintiff's credit, property or business; to the extent that the plaintiff is attempting to recover for

the defamation of its officers, it is not the proper party to assert the claims; and the plaintiff has still not pleaded its claims with sufficient particularity.[FN3] The plaintiff contends that it has adequately stated a claim for trade defamation.

> FN3. In a footnote, the defendants add that the court should strike the plaintiff's defamation claim as to MKM because "[a]s a matter of law, it is impossible for a corporate entity to 'defame' anybody." The court declines to consider this ground for two reasons: the defendants did not raise it in their initial motion to strike; and they do not cite to an authority for their argument, see *Connecticut Coalition Against Millstone v. Connecticut Siting Council,* 286 Conn. 57, 87, 942 A.2d 345 (2008) ("[w]e are not obligated to consider issues that are not adequately briefed ... Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived ... In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority ... will not suffice." (Citations omitted; internal quotations omitted)).

"Defamation or disparagement of a business' goods and services may be considered trade libel ... and is recognized by Connecticut ... courts as a species of defamation ... The torts of trade libel and commercial disparagement, like defamation, require that the alleged damaging statement be make concerning the plaintiff." (Citations omitted.) *OSP, Inc. v. Aetna Casualty & Surety Co.,* 256 Conn. 343, 358-59, 773 A.2d 906 (2001). "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him ..." (Internal quotation marks omitted.) *Cweklinsky v. Mobil Chemical Co.,* 267 Conn. 210, 217, 837 A.2d 759 (2004).

*8 In the present case, the plaintiff alleges that, the defendants, in the course of their discussions with Chung regarding the plaintiff's attempt to purchase a printing press from his company, falsely told Chung that Meier and Basale, the plaintiff's president and vice president, respectively, were dishonest, and that the defendants had an exclusive agreement to represent the plaintiff in its purchase of printing presses.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3328322 (Conn.Super.)
**(Cite as: 2010 WL 3328322 (Conn.Super.))**

These allegations are sufficiently specific and adequately state that the defendants made false statements that disparaged the plaintiff's reputation so as to lower it in the estimation of the business community or to deter others from dealing with the plaintiff. Accordingly, the defendants' motion to strike is denied as to counts thirteen through fifteen.

*Counts Sixteen Through Eighteen*

*Intentional Infliction of Emotional Distress*

In the amended complaint, the plaintiff alleged that the defendants interfered with its efforts to purchase the printing press from Pentagraphix by threatening and enticing Chung to decline to fulfill his company's contract with the plaintiff and by telling Chung that they had an exclusive contract with the plaintiff regarding its purchase of a press. By incorporation into the counts for intentional infliction of emotional distress, the plaintiff alleged that the defendants engaged in this conduct with the intent to inflict emotional distress on the plaintiff, their conduct was extreme and outrageous and caused the plaintiff to suffer severe emotional distress. The defendants moved to strike these counts on the grounds that the conduct upon which they were premised was not extreme and outrageous and because the plaintiff did not specify the threats and enticements that they allegedly made to Chung.

In the revised complaint, as to these causes of action, the plaintiff adds the following allegations: Mark Marino made several misrepresentations to Meier regarding the ownership of the press; after the plaintiff entered into a contract with Pentagraphix to buy the press, Mark Marino told Meier that the plaintiff did not have the right to communicate with Chung or Pentagraphix directly and could only do so through the defendants, and that the plaintiff would never get the press; Chung told Meier and Basale that his company would not sell the press to the plaintiff because the defendants had threatened and enticed Pentagraphix; Chung told Meier and Basale that Mark Marino said they were dishonest and that the defendants had an exclusive agreement to represent the plaintiff in its purchase of a press, and Marino's statements were false; and Woodford, the president of C & S Press, told Basale that the defendants threatened that they would stop giving work to his company if he continued to work for the plaintiff, and

as a result, C & S Press would no longer bid to provide services to the plaintiff. The plaintiff incorporates these allegations into counts sixteen through eighteen and alleges that the defendants engaged in this conduct with the intent to inflict emotional distress on the plaintiff, the conduct was extreme and outrageous, and it caused the plaintiff to suffer severe emotional distress.

**\*9** In their second motion to strike, the defendants move to strike these counts on the grounds that they are legally insufficient because the plaintiff is a corporation, and therefore, cannot suffer emotional distress; and the conduct on which the claims are premised is not extreme and outrageous. The defendants did not raise the first ground in their first motion to strike, although they could have done so. Therefore, the court declines to consider it in the context of the present motion. Regarding the ground at issue, the plaintiff does not offer a specific objection.

"In order for the plaintiff to prevail in a case for liability under ... [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 442-43, 815 A.2d 119 (2003).

As to the second element, which is the only one presently at issue, the Appellate Court has noted that, "[i]n assessing a claim for intentional infliction of emotional distress, the court performs a gatekeeping function. In this capacity, the role of the court is to determine whether the allegations of a complaint ... set forth behaviors that a reasonable fact finder could find to be extreme and outrageous." (Internal quotation marks omitted.) *Stancuna v. Schaffer,* 122 Conn.App. 484, 492 (2010). "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society ... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3328322 (Conn.Super.)
**(Cite as: 2010 WL 3328322 (Conn.Super.))**

the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous! ... Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citations omitted; internal quotation marks omitted.) *Carrol v. Allstate Ins. Co., supra,* 262 Conn. at 433, 443.

In this case, the conduct that the defendants allegedly engaged in is not sufficiently outrageous in character and so extreme in degree as to be regarded as atrocious. Although they may have engaged in unacceptable behavior, it was not sufficiently extreme and outrageous to support the plaintiff's claims for intentional infliction of emotional distress.

*10 Accordingly, the defendant's motion to strike is granted as to counts sixteen through eighteen.

To summarize, for the foregoing reasons, the court denies the defendants' motion to strike as to counts one through fifteen, and grants the motion as to counts sixteen through eighteen.

Conn.Super.,2010.
Wolf Colorprint, Inc. v. Marino
Not Reported in A.2d, 2010 WL 3328322 (Conn.Super.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.